[Crim. No. 7739. In Bank. July 18, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. GREGORY ULAS POWELL and JIMMY LEE SMITH, Defendants and Appellants.

Herbert E. Selwyn and Irving A. Kanarek, under appointment by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

MOSK, J.—A jury found defendants Powell and Smith guilty of first degree murder, and fixed the punishment at death for each defendant. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendants' principal contention is that incriminating statements taken from them by the police without adequate warnings of their constitutional rights were introduced at trial in violation of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965)

62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. After a thorough review of the record we are compelled to conclude that the contention must be sustained and that the judgments must accordingly be reversed for a new trial.

On the evening of March 9, 1963, Los Angeles plainclothes police officers Ian Campbell and Karl Hettinger were patrolling in an unmarked vehicle for the purpose of detecting and suppressing burglaries and robberies. About 10 p.m. they observed defendants' 1946 Ford automobile being driven slowly along a street in Hollywood; its two male occupants were wearing dark clothing and caps, and its license plate was not illuminated. The officers halted the car and identified themselves as police. Powell drew a gun and disarmed Officer Campbell, and at Powell's direction Smith took Officer Hettinger's gun. The officers were ordered into the Ford, and after Smith unsuccessfully attempted to move the police car, Officer Campbell was told to begin driving in the direction of Bakersfield on Highway 99.

When Powell learned their car had been stopped for lack of license plate illumination, he said, "Son of a bitch, we couldn't be any hotter" and "I have already killed two people; I didn't want to get into this business but now that I am in it I have got to go all of the way." Officer Campbell was repeatedly warned to drive in such a manner as to attract no attention. Powell said the officers would be released when they reached a remote spot. He agreed to throw the officers' guns into the brush where they could be found after he and Smith had left, and he returned to Officer Hettinger some money he had taken from him earlier in the ride. At intervals, Powell and Smith engaged in whispered conversations.

After entering Kern County, Officer Campbell was directed to turn off the freeway onto a secluded dirt road pointed out by Smith. Smith suggested the officers be left tied up, but Powell replied, "No; they would freeze to death out here." Shortly thereafter he told Officer Campbell to stop the car, and said, "This is where we are going to let you go." After everyone got out, Powell and Smith appeared to hold another whispered conversation. Powell then asked Officer Campbell whether he had heard of the "little Lindbergh law"; when the officer replied that he had, Powell raised his gun and shot him in the mouth. Officer Hettinger turned and ran; looking back, he saw one of the defendants fire two shots at him while the other fired four shots into Officer Campbell's fallen body. Officer Hettinger testified that from the position of the parties

he believed, though he could not be sure, that it was Powell who fired at him and Smith who fired into the victim's body. It was subsequently determined that Officer Campbell suffered a total of five bullet wounds: one in the mouth, which would not immediately have been fatal, and four in the chest, each of which would have caused death within a matter of minutes; the bullets, moreover, had been fired from two different guns.

Officer Hettinger continued running, and saw what appeared to be a flashlight shining in the area from which he had escaped, then the headlights of a car which seemed to be circling around. He reached a farmhouse and called the Kern County sheriff's office, furnishing a description of defendants. It was then approximately 12:30 a.m. on March 10, 1963.

At 12:40 a.m. two highway patrolmen near Bakersfield received a radio report that a Plymouth automobile had been stolen from a farm; about 1:10 a.m., they were warned that the vehicle might be occupied by suspects in the killing of Officer Campbell. Shortly afterwards they stopped a car fitting the Plymouth's description. Powell was the sole occupant, and the registration receipt he presented matched the license plates but not the vehicle itself. When informed that such a vehicle was reported to be occupied by a murder suspect, Powell replied, "Surely you don't think it was me." One of the officers, having observed Powell dip his left shoulder as the car was brought to a halt, searched under the front seat and found a .32-caliber automatic. Powell admitted he was an ex-convict, and was immediately placed under arrest for carrying a concealed weapon. A box of ammunition and an extra loaded magazine were also found on his person, and a flashlight with the name "Hettinger" printed on it was discovered on the front seat.

Several other officers arrived on the scene, and one stated, "This is the man who shot the police officer." When asked about Hettinger's flashlight, Powell said he would talk only to the "big detective," referring to Chief Deputy Sheriff Fote. Chief Fote entered the patrol car in which Powell had been placed in handcuffs. Powell requested that the doors and windows be closed, then asked if he could "get a break by talking." Chief Fote told him that he would not, and advised him that "anything he might say could be used in court against him." Powell replied that he realized this, but nevertheless proceeded to relate that earlier the previous evening he and one "Jimmy Youngblood," later identified as Smith,

drove around looking for "a possible stickup location"; that they disarmed two Los Angeles police officers who stopped them, and forced them to drive over the Ridge Route and out into a field; that "the first thing that he, Powell, knew, Youngblood was shooting at the officer that had driven the car"; that Powell "was scared" and started to run, as did the second officer; that he saw "Youngblood" circle around in the car, looking for him or the officer; that he arrived at a farmhouse and stole a Plymouth; and that upon reaching his motel he switched license plates and proceeded south on Highway 99 until he was stopped by the patrolmen. He conceded that Officers Campbell and Hettinger had been "very congenial" and had offered no resistance whatever. Finally, he furnished a description of Smith and said he was also an ex-convict. (The foregoing account, which was given partly at the scene of the arrest and partly en route to the Bakersfield county jail, will be referred to as Powell's first statement.)

About 2:45 a.m. Powell was questioned in Chief Fote's office by Officer Cooper. Defense counsel objected to the latter's testimony "on the grounds it is a violation of this defendant's constitutional right to have the presence of an attorney or the advice of an attorney at any time." The prosecutor remarked, "That is a frivolous objection"; although the court instructed the jury to disregard the remark, it subsequently overruled the objection.　■　[See fn. 1] Again, on *voir dire* of the witness defense counsel inquired whether "At any time while you talked to this defendant during this 20 or 30 minutes you mentioned was this defendant advised of his right to have an attorney consult with him?" The court sustained the prosecutor's objection that the question was "immaterial."[1]

Officer Cooper then proceeded to relate the substance of Powell's answers to his questions. They were generally similar to his first statement, but included a number of new details. For example, Powell stated that during the ride with Officers Campbell and Hettinger there was talk "about kidnapping and the F.B.I. would be after them." He continued to accuse Smith of firing all the shots, but added that he,

---

[1] Counsel for Powell renewed his objection virtually every time an extra-judicial statement of his client was offered in evidence. The objection showed considerable foresight, as the trial in this case took place some 11 months before *Escobedo* v. *Illinois* (1964) *supra*, 378 U.S. 478, was decided. By the same token, however, the failure of counsel for Smith to make a like objection does not constitute a waiver or bar him from raising the matter on appeal. (*People* v. *Hillery* (1965) 62 Cal.2d 692, 711-712 [44 Cal.Rptr. 30, 401 P.2d 382].)

Powell, left his guns in the car and did not even have a weapon in his hand at the time of the killing. He stated that Smith drove after the fleeing Officer Hettinger, saying he was going to "kill that other son of a bitch." Powell sought to explain his possession of the automatic at the time of his arrest by claiming that he returned to the scene of the shooting and found the weapon on the ground where it had "possibly" fallen out of the car as Smith drove off. Powell also stated that he and Smith had bought their guns in Nevada "to commit armed robberies"; when asked if he had committed any such robberies in the Los Angeles vicinity, he admitted perpetrating three. (This will be referred to as Powell's second statement.)

At 3:28 a.m. Officer Cooper repeated this interrogation for the purpose of making a tape recording. At the outset the officer asked Powell if he was aware of his "legal rights" and knew that anything he said "may be used as evidence against you at a later time," and Powell replied in the affirmative. Under the officer's questioning Powell reiterated the contents of his second statement, but in still greater detail. In explaining why he pulled a gun on Officer Campbell when they were first stopped, for example, he said that "all I could see was my parole violation" and "I just thought, 'Well, good God, here I am, I just—I'm dead,' you know." He admitted that during the subsequent kidnaping he told his victims, "We're pretty doggone hot." He denied, however, hearing any mention of the "little Lindbergh law" just prior to the shooting. On the basis of information supplied by Officer Hettinger, Officer Cooper then accused Powell of firing the first shot himself, with the automatic; Powell replied, "I can't say it was impossible for it to have been fired at the time, but I didn't fire it," and again accused Smith of firing all the shots. After some questioning by a second detective, the interrogation ended at 4:17 a.m. (This will be referred to as Powell's third statement.)

Thereafter Powell was transported to the Los Angeles police station. At 3:10 p.m. he was interrogated by Officer Brooks, who had taken charge of the investigation. In response to the officer's questions, Powell described his association with "Youngblood"; he claimed that in each of their three robberies together he, Powell, had remained outside as the driver while "Youngblood," wearing makeup, had entered the establishment and actually committed the holdup. (This will be referred to as Powell's fourth statement.) At

3:45 p.m. Officer Brooks again interrogated Powell and a tape recording was made. Powell was asked to describe everything that happened the previous evening after he and "Youngblood" were stopped by Officers Campbell and Hettinger. Powell recounted the story he gave in his first three statements, but in further detail. (This will be referred to as Powell's fifth statement.)

After receiving the results of the autopsy Officer Brooks interrogated Powell at 8:40 p.m., the statement being tape recorded. Officer Brooks acknowledged to Powell that the latter's pregnant common-law wife had been arrested for investigation of robbery, and once more accused him of shooting Officer Campbell, adding that the first shot had been fired into the victim's face. Powell denied the shooting, and the officer said that "all I ask of you" is to "tell me the truth as best you recall it." Powell then repeated his earlier story, admitting however that during the ride with Officers Campbell and Hettinger he told them that if the car was stopped "they were dead." Officer Brooks then revealed the fact that the police had learned the victim was shot with two different guns. Powell denied shooting him with either one, and sought to bolster his protestations of truthfulness by remarking that "I know what the score is. I know that I've had it completely and totally."

As the interrogation continued, Powell admitted that during the ride he and Smith discussed the fact that "we can't let them go and stay in this car, you know, there is no way we can outrun a radio." A second police officer then asked Powell whether the .32 automatic had been loaded at the start of the ride; Powell replied that the magazine was full but there was no shell in the chamber, and that while they were on the freeway he whispered to Smith to make it "ready to go" by pulling back the carriage of the weapon. Powell claimed, however, that the automatic was not fired at the scene. Officer Brooks thereupon disclosed that the police could prove that it was, and asked if Powell was "going to tell me now that [Smith] fired all three guns?" When Powell insisted the automatic had not been fired, Officer Brooks commented on his vehemence and drew an admission that he had a "rather nasty temper."[2] The interrogation ended at

---

[2] "Q. You do lose your temper pretty quickly, don't you?

"A. Yes, I have a rather nasty temper.

"Q. Do you shake like that when you get mad? Do you look like that, like on television or the movies, they say that 'Looks that kill,' like you're looking right now at me?

9 :30 p.m. (This will be referred to as Powell's sixth statement.)

At this point in the investigation Smith was apprehended. About 10 :50 p.m. Officer Milligan entered a rooming house in Bakersfield looking for Smith, having received information that he was armed. Smith appeared, identified himself, and was placed under arrest. When asked where his gun was, Smith nodded in the direction of an adjacent room and said it was in a jacket on the bed, adding, ''It is that detective's gun.'' He was handcuffed and forced to lie on the floor outside his room. He then said, ''The other guy shot that man,'' and asked, ''Do you want me to tell you what happened?'' Officer Milligan replied that he did, and Smith stated briefly that Powell disarmed two policemen in Los Angeles, ''informed'' Smith to come to Bakersfield with them, ''shot that man in cold blood'' when they reached a field, and thrust the detective's gun into his hand and told him to chase the fleeing officer; that he, Smith, was scared and kept on running rather than pursue the officer. (This will be referred to as Smith's first statement.)

Smith was then transported to the Bakersfield police station in a squad car with three officers. En route, a ''conversation'' was held in which Smith reiterated the contents of his first statement, adding that after Powell disarmed the first officer he threatened to kill him unless the second officer gave up his gun, and that he, Smith, was ''too nervous'' to take the gun and the officer handed it directly to Powell. Smith further claimed that after Officer Campbell was shot, Powell fired at Officer Hettinger until his gun was empty and then began shooting with the automatic. (This will be referred to as Smith's second statement.)

Upon learning of Smith's arrest Officer Brooks drove to Bakersfield and began questioning him at 3 :30 a.m. on March 11, in the company of two other officers. The statement was tape recorded. Officer Brooks instructed Smith to ''tell the story the best way you remember,'' and Smith reiterated in greater detail the version he gave to the Bakersfield police. He admitted, however, that Officer Hettinger gave up his gun to him, rather than to Powell as he had previously said. He continued to insist that Powell did all the shooting, but no

---

''A. No, Mr. Brooks. I can't help it. This is the way I have been all my life—well, not all my life. I didn't used to have this bad a temper, but since I got out of Vacaville, it's got worse and worse, and that is the way it is.''

longer claimed he began running when Officer Hettinger did; instead, he said he was "petrified" and did not move. He explained that after the shooting he volunteered to look for Officer Hettinger in the car, then drove off and left Powell behind.

In response to further questioning, Smith assured Officer Brooks that he did not fire a single shot, adding that "I want you to know that I'm not lying to you, you know." When told that Powell had made a similar claim, Smith said, "He did? Well, it don't make any difference because we're both going to get gassed anyway." He admitted that at the time they were first stopped they were looking for a place to rob; he denied however, that he had actually committed any robberies with Powell, saying, "I would be willing to bet my life on it right at this minute." Finally, Smith claimed he could not bring himself to look at Officer Campbell's body, although conceding that "this may seem a little phony to you. . . ." (This will be referred to as Smith's third statement.)

Shortly after 7 a.m. on March 11 Smith was taken to the scene of the shooting. At the request of the police, he directed several officers in a reenactment of the events and portrayed his own role therein. A series of photographs were taken and subsequently introduced in evidence. During the reenactment Smith explained how the shooting took place, but repeatedly denied firing any shots himself. (This will be referred to as Smith's fourth statement.)

Between 7:40 and 9:40 a.m. Smith was transported to the Los Angeles police station in the company of Officer Brooks and two other policemen. During the ride Officer Brooks questioned him as to his relationship with Powell; he again denied committing any robberies with the latter, adding, "I swear it on my mother's name. I want you to believe me." When asked if he could ever kill anyone, Smith admitted, "Maybe in a pinch or for something like getting out of going to death row." And he further stated that in the course of the kidnaping Powell whispered to him, "Jimmy, I told you it was only a matter of time before it would come to this. It's either them or us. Remember the Lindbergh Law?" (This will be referred to as Smith's fifth statement.)

On the third day of the interrogations, March 12, a number of critical admissions were elicited from both defendants. At 10:25 a.m. Officer Brooks informed Smith that the police had "done a little bit more work" since the previous interrogation, and accused him of participating as the driver in rob-

beries committed by Powell. Contrary to the protestations of his third and fifth statements, Smith admitted he had done so, and under further questioning described the various robberies in some detail. (This will be referred to as Smith's sixth statement.)

At 10:40 a.m. Officer Brooks summoned Powell to the interrogation room and said he had "a little news" for him, informing him that "Jimmy Smith has been arrested and he is in the building right here now, and he has told us a different story than the one that you have told us." Powell replied, "Well, as long as you have got Jimmy Smith I may as well tell you that I popped off the first cap and Jimmy popped the caps into the officer after he was down." This extremely damaging admission, of course, was contrary to his repeated prior claims of nonparticipation in the shooting. Five minutes later the interrogation was resumed with a tape recorder, and Powell was asked to tell again how the shooting occurred. He replied, "Well, everything was just exactly like I stated it before except for one thing: When I walked around back of the car and walked up to Jimmy, I don't know exactly how it happened, but my gun went off and I hit the officer and he went down, and he was, when he went down, he laid there, but he was still moving, and the minute it happened I knew, well, there's nothing else to do but go ahead and try to get the other one too, you know, and so I started shooting at the other one, and he was running, and I ran off just about even with the other officer, and while I was shooting at him Jimmy said, 'Hey, this son of a bitch is still alive,' and started popping caps into him." Under further questioning he amplified this statement and repeated it to a police captain, saying that after the shooting of Officer Campbell "we both realized, you know, that it was all over with and we hoped . . . to gain a little time by getting the other officer, too"; he admitted that by the phrase "getting the other officer" he meant finding and killing him. (This will be referred to as Powell's seventh statement.)

At that point Smith was brought in, and Powell repeated the foregoing statement in his presence. Officer Hettinger then entered the room and stated that Powell fired the first shot, knocking Officer Campbell down, and that Smith fired three or four times into the fallen body. Smith's first response to these accusations was simply to inquire whether, "if I fired into the man's body," the shots were rapid or slow; Officer Hettinger answered that they were rapid fire. Subsequently Smith

denied shooting at Officer Campbell at all; when asked to explain how the latter came to be shot four more times, Smith could only reply, ''This sounds weak, but I don't know.'' (This will be referred to as Smith's seventh statement.)

Smith and Officer Hettinger left the room, and at 11:35 a.m. Officer Brooks resumed questioning Powell. Two officers from the robbery detail arrived, and the subject turned to robberies committed by Powell during the preceding few months. He admitted a substantial number, often two or three in one night; Smith was usually the driver in those in which he participated, but on one occasion he went inside with Powell; and when they were stopped by Officers Campbell and Hettinger they were on their way to rob a market in Hollywood but had been caught in a traffic jam. Powell explained that before committing a robbery he would drink until he became relaxed and did not care what happened, and that during the crime ''I was having a ball, you know.'' He said that was the way he felt when he shot Officer Campbell, but added, ''I knew definitely what I was doing after that. I mean, once the officer went down there was no thought in my mind about any—anything except that we had to try to get them both.'' (This may be deemed a continuation of Powell's seventh statement.)

At 4:15 p.m. Powell was again taken to the interrogation room of the police station and was asked by Officer Brooks to tell exactly how he had disarmed Officers Campbell and Hettinger. He complied, giving a detailed description of the event. He added that during the course of the kidnaping he challenged Officer Campbell ''to shoot it out'' with him after they stopped the car, and if he had accepted ''I would have killed him.'' He further admitted that ''I did think of killing the officers as we came down the Grapevine; the thought came to my mind that if we hid their bodies in one of those canyons they never would be found.'' He claimed he ''shied away'' from the idea, but explained that ''I think that I had made up my mind to kill them before, without really facing the fact that this is what I intended to do. I deliberately kept my mind occupied with other thoughts as I walked around the back of the car, raised my gun and shot the officer. I did not consciously think I have to kill. I did not develop upon it. I just raised the gun, fired at him and immediately tried to hit the other officer, still without thinking consciously, 'This man I must kill also,' because if I left the thought enter my mind of what I was doing I might have

become confused and scared enough to do what I knew or felt had to be done."

Contrary to the claims in his prior statements that the shooting of Officer Campbell was accidental, Powell admitted that "I have handled the gun enough that I'm competent with it, and the chances of its going off accidentally are non-existent."[3] He stated that he "aimed for [the officer's] heart," and "The only other alternative was to give myself up or kill him. I think I thought of this previously and felt I would rather be dead myself than give up." These statements were written down verbatim by Officer Brooks and signed by Powell; the interrogation ended at 4:50 p.m. (This will be referred to as Powell's eighth statement.)

Shortly before 7 a.m. on March 13, both Powell and Smith were again taken to the interrogation room. Officer Brooks presented them with a transcript of their taped statements of the previous day and asked them to make any corrections they wished. A number of changes were made, and defendants signed the final version. Smith then told Officer Brooks that "his memory was hazy, and he was sorry he lied to me before." He stated that "He now remembers Powell firing into the officer's body on the ground," a remark which drew an angry denial from Powell. And contrary to his repeated protestations in earlier statements that he did not fire a gun at the scene, Smith admitted for the first time that he fired "one shot from the .32 automatic at the officer who was running away." (This will be referred to as Smith's eighth statement.)

At some point on March 13 defendants were finally taken before a magistrate and arraigned. We note this was four days after defendants' arrests, and after some 16 increasingly incriminating statements had been taken from them by the police. And as will appear, there were more interrogations yet to come.

At 9:30 a.m. on March 15 Smith was questioned by Officer Austin of the robbery detail. He admitted participating in four robberies with Powell in the week preceding the kidnaping, and described them in detail. He further related how they went to Las Vegas on March 8 and 9 for the purpose of buying guns to use in future holdups, and how they engaged in target practice in a dump on their return. The questioning

---

[3] In a subsequent statement he qualified this by saying the gun "did go off by itself one time."

ended at 11 a.m. (This will be referred to as Smith's ninth statement.)

At 6:25 p.m. Powell was transported from the county jail to the police station and further questioned by Officer Brooks, the statement being tape recorded. Saying that "I have to ask you these questions," Officer Brooks caused Powell to relate once again his involvement in the crimes. In addition, however, Powell admitted that if he had had a gun within reach when he was stopped in the stolen Plymouth by the highway patrolmen "I most likely would've tried the same thing again." He emphasized that if Officer Campbell had accepted his offer to "shoot it out," he would have died "and Hettinger would've too." Officer Brooks asked Powell what he would have done if Officer Campbell had tried to turn on him after being disarmed, and he replied, "It would depend upon how gracefully [the officer moved] and whether I thought that he was good enough so that I had to shoot him or not." (This will be referred to as Powell's ninth statement.)

At the conclusion of the interrogation, Powell agreed that in prior statements Smith had "changed his story several times," and Officer Brooks said, "I'm going to ask him again what his story is, and we'll see what it is tonight." Accordingly, at 7:25 p.m. Officer Brooks confronted Smith with all four guns involved in the case, saying, "perhaps it might help refresh your memory or get the story right." Smith reiterated the version he gave in his eighth statement. He again admitted participating in robberies with Powell, and acknowledged that when he denied it in his third and fifth statements "I told you a lie." He further admitted that an earlier statement to the effect that Powell "forced" him to participate was not true because he could have left Powell on many occasions. At the conclusion of the interrogation he said he did not resent Officer Brooks' talking to him, and remarked, "You got a job to do, Sergeant . . . I know that you got to get as much—make the case as clear-cut as you can. . . ." (This will be referred to as Smith's tenth statement.)

Finally, at 8:50 p.m. on March 18 Powell was again taken from the county jail to the police station, where he was questioned by Officer Austin; the statement was tape recorded. Contrary to his claim in his second statement that he had committed only three robberies in the Los Angeles area, Powell admitted perpetrating between 30 and 35 in the month preceding the kidnaping, and described them in detail. Contrary to his claim in his fourth statement that it was Smith

who wore makeup in committing the robberies, Powell admitted wearing the makeup himself on each occasion. He explained that he committed the robberies because he had been unable to find a job and "I just made up my mind, 'Well, God damn it, if I can't earn it honestly, I'll just go out and take it.' " (This will be referred to as Powell's tenth statement.)

Defendants' principal contention is that the receipt into evidence of each of the foregoing extrajudicial statements violated the constitutional rules set forth in *Escobedo* v. *Illinois* (1964) *supra,* 378 U.S. 478, and *People* v. *Dorado* (1965) *supra,* 62 Cal.2d 338. Those rules are controlling here even though the trial took place in 1963, i.e., before they were enunciated. (*People* v. *Rollins* (1967) 65 Cal.2d 681, 687-692 [56 Cal.Rptr. 293, 423 P.2d 221].) By virtue of the same chronology, however, the additional standards prescribed in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], do not govern this appeal. (*People* v. *Rollins, supra,,* at pp. 685-687.)

Under *Escobedo* and *Dorado* extrajudicial statements of a defendant are inadmissible if they were obtained when " (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights." (*People* v. *Dorado* (1965) *supra,* 62 Cal.2d 338, 353-354.)

The first two of these conditions are undoubtedly fulfilled in the case at bar. All the statements introduced in evidence were obtained after the investigation had begun to focus on defendants as particular suspects in the killing of Officer Campbell, and while they were in police custody. The officers who arrested Powell for carrying a concealed weapon knew that he matched the description of one of the murder suspects, was driving a car reportedly stolen from the area of the crime, and had Officer Hettinger's flashlight in his possession; and Smith's statements were made after he had been placed under arrest specifically as a suspect in the murder of Officer Campbell.

Passing for the moment to the fourth condition of *Dorado,* the record does not establish that defendants were

adequately advised at any time of their right to remain silent and their right to counsel. Neither Chief Fote's admonition that Powell's statement "could be used in court against him" nor Officer Cooper's remark that anything Powell said "may be used as evidence against you at a later time" amounted to advice that he had an absolute right to remain silent in the face of police questioning. (See *In re Shipp* (1967) 66 Cal.2d 721, 725 [59 Cal.Rptr. 97, 427 P.2d 761]; *People* v. *Price* (1965) 63 Cal.2d 370, 375-376 [46 Cal. Rptr. 775, 406 P.2d 55].) And a mere warning of the right to remain silent would have been insufficient in any event, for both admonitions must be given (*People* v. *Stockman* (1965) 63 Cal.2d 494, 500 [47 Cal.Rptr. 365, 407 P.2d 277]) and there is no evidence that Powell was told of his right to counsel.[4] The People do not contend that Smith was given any advice whatever as to his various constitutional rights.

▮ Nor does the record show that either defendant made a knowing and intelligent waiver of these rights. Again, it is not contended that Smith made any such waiver; and Powell's acknowledgment that he was "aware" of his "legal rights" is wholly inadequate for this purpose. Even if the remark could be construed as a waiver of his right to remain silent, the interrogations took place before *Escobedo* and *Dorado* were decided, and "To presume in the instant case that absent the warnings defendant knew of his right to counsel at the prearraignment stage prior to the time that the United States Supreme Court established this right in *Escobedo* would be to ascribe to him an utterly fictitious clairvoyance." (*People* v. *Stewart* (1965) 62 Cal.2d 571, 581 [43 Cal.Rptr. 201, 400 P.2d 97], affd. *sub nom. Miranda* v. *Arizona* (1966) *supra,* 384 U.S. 436.)

▮ Turning to the third condition of *Dorado,* the burden is on the People to show that the statements "were the result of something other than a 'process of interrogations that lends itself to eliciting incriminating statements. . . .' " (*People* v. *Stockman* (1965) *supra,* 63 Cal.2d 494, 499.) ▮ On the record before us, the first statement of each defendant was not the product of such interrogations, but rather was a spontane-

---

[4]We cannot infer such advice from the presence of a sign in the Los Angeles County jail stating that after being booked a prisoner could use the pay telephone to call a referral service "If you wish to obtain the services of a lawyer or a bail agent. . . ." By the time Powell was booked he had already made five incriminating statements; there is no showing he ever saw the sign; and even if he had seen it, it would not have informed him he had a right to counsel during interrogation.

ous effort on his part at self-exculpation. Each defendant volunteered immediately after his arrest to tell the police "what happened," and proceeded to do so without solicitation by the officer present. Accordingly, these statements were admissible. (*People* v. *Dorado* (1965) *supra,* 62 Cal.2d 338, 354.) ▆ As the United States Supreme Court observed in *Miranda* v. *Arizona* (1966) *supra,* 384 U.S. 436, 478 [16 L.Ed.2d 694, 726], "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime [citing *Dorado*], or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

▆ The second and subsequent statements of each defendant, however, were clearly the result of constitutionally impermissible interrogations. We reach this conclusion from an analysis of "the total situation which envelops the questioning" (*People* v. *Stewart* (1965) *supra,* 62 Cal.2d 571, 579), noting particularly that defendants were questioned in the interrogation room of police stations on and off for some four days before they were arraigned, and most of their statements were tape recorded; that they were confronted with various items of physical evidence and asked to "tell the truth" and describe how the crime was committed; that the questioning repeatedly covered the same ground, seeking additional incriminating details or admissions; and that when the time was ripe, the interrogating officers accused each defendant of committing specific acts in the course of the crime, then brought them together to observe the effect on the other's claims of nonparticipation.

We conclude that the second and subsequent statements of each defendant were taken in violation of the rules laid down in *Escobedo* and *Dorado,* and hence that it was error to admit them into evidence.

▆ The remaining question is the effect of that error on the judgments. The introduction in evidence of a *confession* obtained from the defendant in violation of constitutional

guarantees is prejudicial per se and compels reversal regardless of other evidence of guilt. (*Jackson* v. *Denno* (1964) 378 U.S. 368, 376 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205]; *Rogers* v. *Richmond* (1961) 365 U.S. 534 [5 L.Ed.2d 760, 81 S.Ct. 735]; *Payne* v. *Arkansas* (1958) 356 U.S. 560, 568 [2 L.Ed.2d 975, 78 S.Ct. 844]; *People* v. *Rollins* (1967) *supra,* 65 Cal.2d 681, 692-693; *People* v. *Schader* (1965) 62 Cal.2d 716, 728-731 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Dorado* (1965) *supra,* 62 Cal.2d 338, 356, and cases cited.) By contrast, the erroneous introduction of an *admission* is not prejudicial per se and the appellate court must weigh its impact on the trial in the light of the appropriate "harmless error" test. (See, e.g., *In re Shipp* (1967) *supra,* 66 Cal.2d 721, 726; *People* v. *Smith* (1966) 63 Cal.2d 779, 802 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Hillery* (1965) 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382].)[5]

 While the foregoing distinction is generally workable, the case at bar illustrates the difficulties that can arise in seeking to categorize a given statement as a "confession" or an "admission." In his first statement each defendant attempted to shift to the other the blame for the murder but confessed to participating in the kidnaping of Officers Campbell and Hettinger. Powell's subsequent concession in his seventh statement that he accidentally shot Officer Campbell in the course of that kidnaping was the equivalent of a confession of second degree murder by operation of the felony-murder rule. (*People* v. *Ford* (1966) 65 Cal.2d 41, 57-58 [52 Cal.Rptr. 228, 416 P.2d 132].) In Powell's eighth statement he conceded that the chances of his gun's firing accidentally were "non-existent," that he "aimed for [Officer Campbell's] heart" when he shot him, and that faced with the "only alternative" of surrendering or killing him, Powell felt he "would rather be dead myself than give up"; these concessions amounted to a confession of deliberate and premeditated first degree murder. Although Smith made no such confession in so many words, his statements fully implicated him as Powell's confederate in robbery and kidnaping, and his concession in his eighth statement that he shot at the

---

[5]There is language in *People* v. *Matteson* (1964) 61 Cal.2d 466, 469 [39 Cal.Rptr. 1, 393 P.2d 161], to the effect that the rule of prejudice per se governs admissions as well. The remark was dictum, however, for the statement introduced in that case amounted to a full confession of the crime charged. The dictum has never been followed, and it is hereby disapproved.

fleeing Officer Hettinger could be taken as a confession of attempted murder.

On the record before us, however, we need not decide whether the inadmissible statements of these defendants were merely admissions or were so self-incriminating, either singly or collectively, as to bring into operation the rule of prejudice per se. As will appear, the judgments must be reversed in either event.

If the rule of prejudice per se is applied, the facts do not permit the People to invoke the exception thereto illustrated by *People* v. *Jacobson* (1965) 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555], and *People* v. *Cotter* (1965) 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862].[6]

In *Jacobson* the prosecution introduced a series of some ten separate confessions by the defendant; but the first eight of these were volunteered by him in circumstances which rendered them admissible, and only the last two were in violation of the *Escobedo-Dorado* rules. We recognized the general principle that the erroneous introduction of a confession is necessarily prejudicial (63 Cal.2d at p. 329), but we held that the unusual facts presented made it one of the ''rare cases'' in which we nevertheless were bound to inquire into the impact, if any, of the error. We particularly observed (at p. 330) that ''No undue emphasis was placed on any of the confessions at the guilt phase,'' noting that the tape recording of the inadmissible statements was not played to the jury until the penalty phase. We further stressed that ''No one confession contained details significantly different from the others. The two improperly obtained statements were therefore merely cumulative.'' (*Id.* at p. 331.) We reasoned that ''It is not plausible, having reviewed this record, to conclude that 10 statements were sufficiently more persuasive than only eight and that the elimination of two would have altered the outcome.'' (*Ibid.*)

Similarly, in *Cotter* the prosecution introduced seven self-

[6]The judgment in *Cotter* was vacated by the United States Supreme Court in (1967) 386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 1035], for reconsideration of the effect of the *Griffin* error ( *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] [comment on defendant's failure to testify violates his privilege against self-incrimination]) in the light of the test enunciated in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. Accordingly, by minute order of April 20, 1967, we recalled the remittitur and vacated our decision. In the meantime, the defendant's sentence of death had been commuted by the Governor. By minute order of June 14, 1967, we dismissed the appeal upon request of the defendant, consented to by his attorney.

incriminating statements by the defendant, the first four being admissible and the last three violating *Dorado*. We held the error to be nonprejudicial, emphasizing that ''The several statements in the police station added nothing to the essentials of the crime which had previously been volunteered by defendant,'' except that the seventh statement did add certain details; the latter, however, ''was essentially a composite of the first four statements, all of which were given by defendant prior to his being questioned at the police station. The various statements did not contradict each other in any substantial degree and none of the details added by the seventh could have had any material effect on the outcome of the trial.'' (63 Cal.2d at pp. 390, 392.)

None of the foregoing reasoning can be applied to the facts of the case at bar. Here, the ratio is reversed: each defendant made only one admissible statement, followed by a series of nine which were inadmissible. The first statement of each defendant was a brief attempt at self-exculpation in which he accused the other of firing all the shots, then claimed to have taken fright and fled from the scene. In the subsequent statements, however, a very different picture emerged. As we have set forth in detail above, over a period of several days the defendants admitted an increasing degree of involvement in the kidnaping and murder. In due course, for example, each admitted he did fire a gun at one or both of the victims; at least two of the statements indicated the shooting was deliberate and premeditated, and several provided a motive in the form of a compelling desire to avoid being taken back into prison. In their later statements, moreover, both defendants admitted they had jointly perpetrated a number of armed robberies in the Los Angeles area shortly before the date here in issue.

Contrary to *Jacobson* and *Cotter,* accordingly, here the subsequent statements did add ''significantly different'' details to the first and supplied a number of missing ''essentials of the crime.'' The statements in this case did ''contradict each other''; in fact, each defendant admitted in several later statements that he had lied in earlier ones. Such an array of progressively incriminating statements cannot be deemed ''merely cumulative.'' Since ''the admissible evidence does not include an equally damaging confession'' (*People* v. *Price* (1965) *supra,* 63 Cal.2d 370, 377), the error is reversible per se if the statements are deemed to be confessions.

If on the other hand the statements are treated as

admissions, the evidence just discussed also demonstrates that their introduction was prejudicial error, for it may well have sealed the case against these defendants. Indeed, the prosecutor himself repeatedly stressed how incriminating the statements were, and proceeded to make the most of them in his trial strategy. ▮ We recently recognized that "Any meaningful assessment of prejudice must proceed in the light of the entire record, and we must therefore consider not only the direct effect of the statements because of *what they say,* but also any indirect effect that they might have had because of *the way in which they were used.*" (Italics in original.) (*People* v. *Gonzales* (1967) 66 Cal.2d 482, 493 [58 Cal.Rptr. 361, 426 P.2d 929].)

▮ To begin with, the statements constituted a prominent feature of the People's case in chief, and their introduction in evidence occupied a substantial portion of the trial. Not only were their contents put before the jury in full detail by the testimony of the interrogating officers, but many were repeated verbatim through the device of playing the tape recordings for the jurors immediately after the transcriptions thereof had been read to them. As a result, the total number of times the jury heard these statements approached thirty.

In his cross-examination of defendants, moreover, the prosecutor frequently invoked these statements to draw from defendants the confession that they had lied to the police in their earlier interrogations.[7] And here, even more than in *Gonzales,* the prosecutor used defendants' statements with devastating effect in his argument to the jury. He prefaced his discussion at that point by saying, "I will go into this to show how each and every statement made by each of these defendants that shows *tremendously damaging statements made to an officer shortly after their arrest* has been either forgotten or denied, or denied and then admitted, but still denied." (Italics added.) But he did not simply reiterate the contents of the statements; rather, he said "let's get into the sequence" of the interrogations, and emphasized repeatedly how they became more and more self-incriminating as defend-

---

[7] In cross-examining Smith, the prosecutor also used for impeachment purposes a statement which had not been introduced in the People's case in chief. Taken shortly after Smith's arrest, it included an admission that he could not kill in cold blood "other than maybe to escape or something. . . . Maybe it was doing time, or something, that made me, could build myself up to something, or—or, if I thought I could escape the death row."

ants realized how much the police had learned about the crime. Thus, referring to Smith's third statement (his first to Officer Brooks), the prosecutor argued that "Jimmy Smith has not got all of the answers at this time so he is not telling anybody about those four bullets into the body itself. He is waiting." Commenting on Smith's sixth statement, the prosecutor stressed that "Smith finally, on March 12th, 1963, in the early morning hours of March 12th, 1963, some two days after this killing, finally admits that he was Powell's driver on four robberies, after swearing on his life that he had never committed any robberies before that." Turning to Powell's seventh statement (immediately prior to the first joint interrogation), the prosecutor emphasized that "[Powell] says, 'I don't know exactly how it happened,' but he knows that Jimmy Smith is there and he knows that he has got to change his story, but fast." Noting that Smith first admitted having fired a shot at the scene after learning the police had found an empty .32-caliber cartridge nearby (in his eighth statement), the prosecutor commented that "He's got to say something; they have got physical evidence and, as he finds out more and more he manufactures the story to fit the facts."[8]

We recognize that here, as distinguished from *Gonzales,* the proofs were not closely balanced. On the contrary, the physical evidence, the testimony of Officer Hettinger and the admissible statement of each defendant, added up to strong evidence of defendants' guilt of first degree murder. But since the decision in *Chapman* v. *California* (1967) *supra,* 386 U.S. 18, 23 [17 L.Ed.2d 705, 710], our inquiry may not be limited to that consideration when a federal constitutional error is in issue, and we may no longer rely on article VI, section 13, of our Constitution to save a judgment infected with such an error. Rather, applying the *Chapman* test to this record, as we must, we are compelled to conclude there is at least a reasonable "possibility" that the evidence complained of "might have contributed to the conviction" (*Fahy* v. *Connecticut* (1963) 375 U.S. 85, 86 [11 L.Ed.2d 171, 173, 84 S.Ct. 229]) and the People have not proved the error to be "harmless beyond a reasonable doubt" (*Chapman* v. *California, supra,* at p. 24 [17 L.Ed.2d 711]). Indeed, we have seen how important these statements were to the People's case, and "There is

---

[8]In addition, the prosecutor repeatedly exploited the discrepancies between defendants' extrajudicial statements and their testimony in court, implying that the latter was fabricated to fit the occasion. (Cf. *People* v. *Gonzales* (1967) *supra,* 66 Cal.2d 482, 494-495.)

no reason why we should treat this evidence as any less 'crucial' than the prosecutor—and so presumably the jury—treated it.'' (*People* v. *Cruz* (1964) 61 Cal.2d 861, 868 [40 Cal.Rptr. 841, 395 P.2d 889].)[9]

 It bears emphasizing, moreover, that the foregoing violations of *Escobedo* and *Dorado* were not the only serious errors committed in this trial. Many of the extrajudicial statements of each defendant implicated—indeed, accused—the other. It is true that the court instructed the jury to consider each statement only against the declarant, but that admonition was insufficient on two grounds to protect defendants' rights in this regard.

In *People* v. *Aranda* (1965) 63 Cal.2d 518, 530 [47 Cal. Rptr. 353, 407 P.2d 265], we disapproved of this practice as ''prejudicial and unfair to the nondeclarant defendant,'' observing that the policies in favor of joint trials ''must·be subordinated when they run counter to the need to insure fair trials and to protect fundamental constitutional rights.'' (*Id.* at fn. 9.) Here the court did not determine, as required by *Aranda*, whether those parts of the statements implicating a codefendant could effectively be deleted without prejudice to the declarant; instead, each such statement was admitted in its entirety, prefaced by a recital of the inadequate admonition.

 The *Aranda* rule operates, of course, even when each statement is properly admissible against the declarant. But here the second and subsequent statements of each defendant were inadmissible against him under *Escobedo* and *Dorado*. It was therefore error, entirely apart from the failure to employ the procedures prescribed in *Aranda*, to introduce against either defendant any of the later statements of his codefendant which implicated him. As we explained in *Aranda*, ''At best, the rule permitting joint trials in such cases is a com-

[9]Such prejudice was not dispelled by the fact that defendants told their stories on the witness stand. As in *People* v. *Spencer* (1967) 66 Cal.2d 158, 169 [57 Cal.Rptr. 163, 424 P.2d 715], ''the record in this case fails to dispel beyond a reasonable doubt the possibility'' that defendants' testimony might have been impelled by the erroneous introduction of their self-incriminating statements. In any event each defendant, far from admitting his guilt in the courtroom, claimed his intent was to free Officers Campbell and Hettinger at a safe place, insisted his gun went off accidentally, and denied firing any shots into the fallen body of Officer Campbell. Once again, therefore, the admissible testimony did not include ''an equally damaging confession'' (*People* v. *Price* (1965) *supra*, 63 Cal.2d 370, 377; see also *People* v. *Rollins* (1967) *supra*, 65 Cal.2d 681, 692-693, fn. 12).

promise between the policies in favor of joint trials and the policies underlying the exclusion of hearsay declarations against one who did not make them. [Fn. omitted.] When, however, the confession implicating both defendants is not admissible at all, there is no longer room for compromise. The risk of prejudicing the nonconfessing defendant can no longer be justified by the need for introducing the confession against the one who made it.'' (63 Cal.2d at p. 526.) Accordingly, we held that the introduction of a confession violative of the *Escobedo-Dorado* rules and implicating a codefendant is not rendered harmless as to the latter by an instruction that the confession may be considered only against the declarant. (Accord, *People* v. *Charles* (1967) 66 Cal.2d 330, 343 [57 Cal.Rptr. 745, 425 P.2d 545].)

 Other fundamental errors occurred at the penalty phase of this trial. The People introduced statistical evidence of the average time actually served by defendants sentenced to life imprisonment before they are released on parole. In his argument to the jurors the prosecutor repeatedly stressed the possibility of parole as a factor for their consideration in determining which penalty to impose, and further advised them that if they fixed the penalty at death their decision would be reviewed by the trial judge, the Supreme Court, and the Governor. Finally, the court gave instructions specifically authorizing the jurors to take the foregoing factors into account in their deliberations. This evidence, argument, and instructions resulted in the very errors we condemned in *People* v. *Morse* (1964) 60 Cal.2d 631, 636-653 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], and in effect held to be reversible per se in *People* v. *Hines* (1964) 61 Cal.2d 164, 170 [37 Cal.Rptr. 622, 390 P.2d 398].

We recognize that the trial in this case took place before the rules of *Aranda* and *Morse* were enunciated; under our settled practice, we are compelled to apply them to all cases still pending on direct appeal. (*People* v. *Charles* (1967) *supra*, 66 Cal.2d 330; *People* v. *Hines* (1964) *supra*, 61 Cal.2d 164.) As will appear, however, the police and prosecuting authorities are not blameless even under the law as it stood at the time of the investigation and trial.

Since 1934 article I, section 8, of the California Constitution has provided in relevant part that ''When a defendant is charged with the commission of a felony, by a written complaint subscribed under oath and on file in a court in which the felony is triable, he shall, *without unnecessary delay*, be

taken before a magistrate of such court." (Italics added.) Penal Code section 849, subdivision (a), has provided in substance since 1872 that "When an arrest is made without a warrant by a peace officer or private person, the person arrested, if not otherwise released, must, *without unnecessary delay,* be taken before the nearest or most accessible magistrate in the county in which the offense is triable, and a complaint stating the charge against the arrested person, must be laid before such magistrate." (Italics added.) (See also Pen. Code, § 859.) More specifically yet, since 1927 Penal Code section 825 has provided that "The defendant must in all cases be taken before the magistrate without unnecessary delay, and in any event, *within two days after his arrest,* excluding Sundays and holidays; . . ." (Italics added.)[10]

 As set forth above, Powell and Smith were arrested on Sunday, March 10, 1963, but were not taken before a magistrate and arraigned until Wednesday, March 13. Even if the Sunday is not included in the computation, these defendants were therefore held by the police for three days before they were arraigned, advised of their rights and furnished with counsel as the law requires (Pen. Code, §§ 858, 859). That delay "violates a fundamental right of the arrested person and is in disobedience of the law." (*People* v. *McDowell* (1962) 204 Cal.App.2d 734, 736 [22 Cal.Rptr. 646].) We have characterized such conduct by the police as "patently illegal," and have rejected the argument that its illegality is somehow lessened by the fact that "similar conduct is not unusual" or "makes the work of the police and the district attorney easier." (*People* v. *Stroble* (1951) 38 Cal.2d 615, 625 [226 P.2d 330], affd. 343 U.S. 181 [96 L.Ed. 872, 72 S.Ct. 599].) Indeed, we have further stressed that section 825 does not authorize even a two-day detention in all cases, "but, instead, places a limit upon what may be considered a necessary delay, and a detention of less than two days, if unreasonable under the circumstances, is in violation of the statute." (*Dragna* v. *White* (1955) 45 Cal.2d 469, 473 [289 P.2d 428].)

 It is true that the federal rule of *McNabb* v. *United States* (1943) 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608], i.e.,

[10]Penal Code section 145 has provided since 1872 that "Every public officer or other person, having arrested any person upon a criminal charge, who willfully delays to take such person before a magistrate having jurisdiction, to take his examination, is guilty of a misdemeanor."

that any confession obtained during an illegal detention is ipso facto inadmissible, has not been adopted in California (*Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 10 [291 P.2d 929]), and that a violation of a defendant's right to be taken before a magistrate without unnecessary delay does not require reversal "unless he shows that through such wrongful conduct he was deprived of a fair trial or otherwise suffered prejudice as a result thereof" (*People* v. *Combes* (1961) 56 Cal.2d 135, 142 [14 Cal.Rptr. 4, 363 P.2d 4], and cases there cited). But these holdings must not be misconstrued as acquiescence on our part in any continuation of such unlawful practices. The Constitution and the several statutes quoted above are clear and explicit on this point, and must be obeyed. ▉▉▉ The principal purposes of the requirement of prompt arraignment are to prevent secret police interrogation, to place the issue of probable cause for the arrest before a judicial officer, to provide the defendant with full advice as to his rights and an opportunity to have counsel appointed, and to enable him to apply for bail or for habeas corpus when necessary. ▉▉▉ As the United States Supreme Court observed in *Mallory* v. *United States* (1957) 354 U.S. 449, 454-455 [1 L.Ed.2d 1479, 77 S.Ct. 1356], construing rule 5(a) of the Federal Rules of Criminal Procedure which is similar in this respect to our own legislation, "The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt.

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession."

▉▉▉ In the case at bar the delay was used to "extract" from these defendants not one but fourteen self-incriminating statements, even though two had already been voluntarily given. Proper investigative procedures, such as scientific analysis of the physical evidence, were no doubt also undertaken during this period; but they could equally well have been pursued after arraignment, and do not justify holding

defendants virtually incommunicado. The intent of the police in doing so, it clearly appears from the record, was to permit repeated interrogation of defendants until they condemned themselves out of their own mouths and provided the prosecutor with an airtight case against them. Indeed, Smith recognized as much at the end of his tenth statement when he remarked to his interrogator, ''You got a job to do, . . . [to] make the case as clear-cut as you can.''[11]

As the judgment must be reversed because of violation of the *Escobedo-Dorado* rules, we need not decide at this time whether the circumstances just described amounted to such prejudice as to render reversible the denial of defendants' constitutional and statutory rights to prompt arraignment. But we cannot condone such conduct by the police, and any repetition thereof will be closely scrutinized.

Similarly, there appears little if any justification for the prosecutor's trial technique of playing to the jurors the tape recordings of defendants' statements immediately after the complete transcriptions thereof had been read to them from the witness stand. The prosecutor's proffered explanations—e.g., that the jurors should be allowed to judge the participants' ''tone of voice''—do not outweigh the prejudice that must have ensued from the sheer repetition of these inadmissible statements, which as we have noted were thereby heard in court nearly thirty times. In view of the strong case the prosecutor had without the use of the statements, we are

---

[11]This submissive acceptance of an inquisitorial process was the desired result of a number of ''techniques'' used on defendants. For example, Officer Brooks maintained an air of confidence in defendants' guilt, and his ''conversations'' with them were often characterized as merely ''a few questions'' about certain ''details''; yet while they began with relatively minor topics, they soon proceeded to issues central to establishing that the crime was in fact committed by these defendants and was murder in the first degree. For the most part each defendant was interrogated separately; the hard facts known to the police were revealed to him one by one, and he was trapped in a web of shifting and inconsistent explanations. At the appropriate moment, each defendant was then brought into the presence of the other and of Officer Hettinger, and the effects of this confrontation were carefully recorded. Most importantly, throughout these four days of questioning Officer Brooks successfully cultivated a relationship of trust and ''friendship'' with these defendants, despite the fact he must have believed they had murdered one of his brother officers. Such psychological devices for extracting confessions without crossing the line of coercion were condemned by the United States Supreme Court in *Miranda* v. *Arizona* (1966) *supra,* 384 U.S. 436, 445-458, as techniques by which the police ''subjugate the individual to the will of the examiner'' and ''persuade, trick, or cajole him out of exercising his constitutional rights.'' (*Id.* at pp. 457, 455.)

impelled to conclude that this prejudice was intentionally inflicted.

Only one other issue requires our attention for the guidance of the court upon retrial.

▇▇▇▇ Defendants urge that the Superior Court of Los Angeles County does not have territorial jurisdiction to try the charge of murder in this case because the killing took place in Kern County and Officer Campbell's body was discovered there. Section 790 of the Penal Code, upon which defendants rely, provides in relevant part that the jurisdiction of an action for murder is in the county where the fatal injury was inflicted or where the victim died or his body is found.

Penal Code section 781, however, provides that "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory." In *People* v. *Abbott* (1956) 47 Cal.2d 362 [303 P.2d 730], as in the instant case, a kidnaping began in one county and the body of the victim was found in another. We held that section 790 was not intended to exclude the application of other statutory provisions dealing with territorial jurisdiction in criminal cases, and that under section 781 the county in which the "preliminary arrangements" for the crime were made is a proper county in which to prosecute the completed offense, "although the acts performed there did not constitute an essential element of the crime." (*Id.* at p. 370; see also *People* v. *Buffum* (1953) 40 Cal.2d 709, 717 [256 P.2d 317]; *People* v. *Buono* (1961) 191 Cal.App.2d 203, 222-226 [12 Cal.Rptr. 604].)

▇▇▇▇ Defendants seek to distinguish *Abbott* on the ground that there the defendant was charged with both kidnaping and murder, while in the instant case there was no charge of kidnaping. We are satisfied that territorial jurisdiction in criminal cases should depend upon the acts committed rather than upon the form of the accusatory pleading. Even if we were to accept the suggested distinction, it would mean only that the pleading would have to be amended to include a kidnaping count before a new trial could be held, and not that defendants could not be tried for murder in Los Angeles County. Section 781, however, is not limited to cases involving a joinder, but applies also where only a single offense is

charged. The section was intended to broaden criminal jurisdiction beyond the rigid limits fixed by the common law in cases of crimes committed in more than one jurisdiction. (*People* v. *Gonzalez* (1960) 180 Cal.App.2d 285, 288 [4 Cal.Rptr. 822]; *People* v. *Waid* (1954) 127 Cal.App.2d 614, 617 [274 P.2d 217].) Since section 790 is not exclusive in cases of murder, section 781 may properly be applied here. It follows that although the kidnaping of Officers Campbell and Hettinger in Los Angeles may not have constituted an essential element of the murder offense, there took place in Los Angeles County sufficient acts preliminary to the murder to allow jurisdiction to attach in that county under section 781.

We do not lightly reverse these judgments. We are well aware of the heinous nature of the crime involved, and of the strong indications of defendants' guilt. But if a government of laws is to be preserved, our justifiable outrage must not result in denying to these defendants a fair trial and a dispassionate review of their appeal. We deplore their acts, but it is fundamental to our system of justice that these defendants be accorded the same treatment under the law as that provided the least blameworthy of wrongdoers. The sad lesson of history is that any other path leads inevitably to the arbitrary injustice of the tyrant. It is to protect the rights of the innocent as well as the guilty that rules of law must be respected, and therefore that these defendants must be tried a second time.

The judgments are reversed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.