[Civ. No. 25314.   Second Dist., Div. One.   Oct. 16, 1961.]

LEWIS N. BURATTI, JR., Appellant, v. WILLIAM PHETTEPLACE, Respondent.

Graham A. Ritchie for Appellant.

Spray, Gould & Bowers for Respondent.

WOOD, P. J.—While plaintiff was on the upper level or platform of a scaffold, plastering the exterior of a two-story apartment building, the scaffold collapsed and caused plaintiff to fall to the ground and sustain personal injuries.

Defendant had constructed the scaffold, under the provisions of a contract with plaintiff's employer (plaintiff's father) who was the plastering contractor in the construction of the building.

In this action for damages for personal injuries, resulting from the fall, judgment upon a verdict was for defendant. Plaintiff appeals from the judgment.

Appellant contends: (1) that the court erred in receiving extensive testimony regarding custom in constructing scaffolds, which custom was contrary to the requirements of safety orders of the Department of Industrial Relations; (2) that the court erred in receiving extensive testimony and other evidence concerning an "exemplar scaffold" which was constructed by defendant.

The scaffold (involved here), which was constructed of wood, extended along the four sides of the building and was connected at the building corners by the overlapping of the scaffold-platform boards—that is, at each corner of the building the ends of the platform boards which were on one side of the building rested upon or overlapped the ends of the platform boards which were on another side of the building. A further description of the scaffold is that it was about 18 feet high, and there were two levels or platforms which, respectively, were about 7 feet and 14 feet from the ground. The uprights which supported the platforms were "2 by 4

inch'' boards—the inner upright was about 6 inches from the wall of the building, and the outer upright was about 3 feet from the inner upright (i.e., outward from the building), and each section or bay of the scaffold (lengthwise distance between the sets of inner and outer uprights) was about 10 feet in length. The platform in each section or bay consisted of two boards, each of which was 2 inches by 12 inches by 10 feet. There were cross-braces, 16 feet in length, on some of the sections or bays. When the scaffold was constructed there were guard rails at the top of the uprights and between the two levels; and there were ''tie-ins'' on the inner uprights whereby the scaffold was tied or attached to the building. The ''tie-ins'' consisted of short boards (2'' x 6'' x 18'')— one end of which was nailed to an inner upright and the other end was nailed to a joist of the building. The ''tie-in'' board extended into the building, and the plaster was applied ''around'' the board—with the result that after the removal of the board there was a hole (2'' x 6'') in the plastered wall.

As above stated, the plaintiff's father was the plastering contractor, and the plaintiff, a plasterer, was employed by him. The procedure in plastering the building was, in general, as follows: The ''scratch coat'' of plaster was applied to the outside of the building. Then plaster was applied inside the sixteen apartments in the building. Thereafter the ''brown coat'' of plaster was applied to the outside of the building. Several weeks thereafter the ''finish coat'' was applied.

On the day of the accident, when the last coat or ''color coat'' was to be applied on the outside, the plaintiff and his father were on the upper platform of the scaffold at the northeast corner of the building—for the purpose of applying the color coat to the east wall. The color coat had been applied to the north wall. Plaintiff was on the corner of the scaffold where the ends of the platform boards on the north side of the building overlapped or were in contact with the ends of the platform boards on the east side. When the father applied the first trowel of plaster on the east wall, one section or bay of the scaffold on that side pulled away from the building and fell back over a fence. When that portion of the scaffold pulled away from the building and became disconnected from the scaffold on the north side, two sections or bays of the scaffold on the north side collapsed and fell to the ground. Parts of the scaffold fell upon plaintiff.

There was evidence on behalf of the plaintiff that the scaffold was not constructed in compliance with the safety

orders of the Department of Industrial Relations in that: (1) Some of the uprights were not butted together with the "scab" on each side properly nailed, but the uprights were overlapped. (2) A continuous ribbon was not on the outer uprights.

There was evidence on behalf of defendant that the scaffold was constructed in substantial compliance with the safety orders. Also, there was evidence that prior to the accident all the "tie-ins" had been removed from the north wall; that there were only a few "tie-ins" on the east wall; that there were no "tie-ins" on the south wall; there were no "X-braces" or straight braces on the scaffold along the southwest portion of the west wall; several guard rails had been removed from the scaffold. There was evidence that the structure of the scaffold had been changed by the plasterers after the defendant's employees had constructed the scaffold.

Section 1645, subdivision (1), of article 23, of the Administrative Code (pertaining to Construction Safety Orders of the Division of Industrial Safety of the Department of Industrial Relations) provides, in part (with reference to "Uprights") : ". . . The splices of uprights shall be made with square butt joints, and scabs one-inch by four-inch (1″ x 4″) or heavier material at least thirty inches (30″) long shall be nailed on two (2) sides of each upright with six (6) nails in each half of the scab."

Subdivision (2) of said section 1645 provides, in part (with reference to "Ribbons") : ". . . The ribbons shall be one-inch by six-inch (1″ x 6″) or heavier material, placed on the outer uprights, directly under, and in contact with, the ledgers."

Appellant states that he tried the case on the theory that the failure of defendant to provide a continuous ribbon beneath the ledgers for support, and that the extension of the uprights by lapping instead of joint butting, together with other less important violations of the safety orders, were the causes of the collapse of the scaffold.

The scaffold as constructed did not have a continuous ribbon on it, and some of the uprights were not spliced with scabs as described in said section of the safety orders.

The defendant presented testimony to the effect that the scaffold was constructed in compliance with the standard custom or practice of constructing scaffolds in the Southern California area. Mr. Reid, a construction safety engineer employed by the Division of Industrial Safety, called as a

witness by defendant, testified that the method of constructing the scaffold (as shown by photographs in evidence—where there is no ribbon or scab splicing) is in compliance with the standard customary practice of scaffolding contractors working under his jurisdiction in Southern California. He also testified to the effect that the guard rail at the top of the scaffold and the mid-rail (between the two levels) take the place of a ribbon; and that the method of splicing the uprights (by nailing uprights together where they overlap a sufficient distance) is in compliance with standard customary practice.

Mr. Baumgartner, called as a witness by defendant, testified that he is engaged in the business of constructing scaffolds; that the design of the scaffold here involved (as shown by photographs in evidence) particularly with reference to the uprights, guard rail, and braces, and with reference to the absence of a ribbon, is in accordance with the customary practice of scaffolding contractors in this area.

While defendant Phetteplace was a witness, his counsel asked him if the guard rails were installed in accordance with the standard custom or practice of scaffold building in this area. The plaintiff objected to the question and stated: "I think counsel is trying to establish a different standard of care than the law provides. The law provides the standard. Custom doesn't make a bit of difference in this area." Counsel for defendant said: "I am not attempting to establish anything different. I am trying to show that this does comply with the law; and this is not contrary to the requirements of the law." The judge said: "That will be up to the jury ultimately, but the question as to whether it complies is admissible; I will overrule the objection; that is, whether it complies with the custom. Whether or not that custom is safe or not is for the jury to determine. I will overrule the objection."

It is to be noted that, in addition to section 1645 of the Administrative Code which is above referred to, there is another section of that code, namely, section 1640, which relates to the requirements for constructing scaffolds. Said section 1640, article 22, of the Administrative Code, provides: "Scaffolds may be constructed of wood or other suitable materials such as steel or aluminum members of known strength characteristics. Where materials other than wood are used and where scaffold designs differ from those specified in these orders, the scaffold and its parts must provide a degree of strength, rigidity and safety equivalent to that provided by

the described scaffold it replaces. Anchorage and bracing shall be such that scaffolds and falsework will be prevented from swaying, tipping or collapsing.'' It thus appears that a scaffold, which is built according to a design different from the design specified in said section 1645, would comply with the safety orders of the Administrative Code if its parts provided a degree of strength, rigidity and safety *equivalent* to that provided by the described scaffold it replaced. Defendant asserts in effect that, at the trial, he was not attempting to explain a failure to comply with safety orders stated in section 1645, but that he was showing that he complied with such orders by constructing, under section 1640, a ''different design'' which, according to the customary standard, was equivalent to that scaffold described in section 1645. The court instructed the jury that: ''Evidence as to whether or not a person conformed to a custom that had grown up in a given locality or business is relevant and ought to be considered, but is not necessarily controlling on the question whether or not he exercised ordinary care, for that question must be determined by the standard of care that I have stated to you.'' An issue of fact was whether the scaffold provided a degree of strength, rigidity and safety equivalent to that provided for a scaffold described in said section 1645. Evidence as to custom in the business of constructing scaffolds was some evidence as to what method or design of constructing parts of a scaffold provided a degree of strength, rigidity and safety equivalent to the described scaffold. The court did not err in receiving the evidence as to custom.

Appellant also contends, as above indicated, that the court erred in receiving evidence as to tests of an ''exemplar scaffold'' which the defendant constructed. Mr. Peterson, a structural engineer, who was called as an expert witness by plaintiff, was asked (by plaintiff's counsel) whether the scaffold involved here would provide the same degree of strength as a scaffold of the design depicted in Exhibit 8 (a copy of the design of scaffold set forth as Figure 8 in said section 1645 of the Administrative Code). He replied that the scaffold involved here would provide less strength than a scaffold of the design on Exhibit 8. He also testified as to the number of pounds there would be in a safe load and in a failure load on a scaffold built according to the respective designs. After that testimony had been given, the defendant Phetteplace instructed his employees to build a two-level scaffold. He testified that they built three bays of such a

scaffold in accordance with his usual and customary design and practice in the installation of scaffolds; that he supervised the construction; that those bays were constructed in the same manner as the scaffold involved here; thereafter he caused certain tests to be made of the scaffold. He also testified that he had not seen the scaffold (involved here) prior to the accident, but he did see it after the accident and while it was on the ground.

Mr. Hiller, called as a witness by defendant, testified that he is a chemical engineer and an employee of a laboratory that is in the business of testing mechanical devices; he tested the scaffold (which had been constructed during the trial). He testified further as to the manner of making the tests. Then counsel for defendant asked him what type of force the particular test was designed to apply to the scaffold—vertical or horizontal force. Thereupon counsel for plaintiff said: "I will object to this entire line of questioning. Rather than to burden the record with each question, if I may have a running objection on the ground of lack of foundation; no showing that the type being tested is at all equivalent to the scaffold that collapsed." The judge said: "All right. So the record will be clear, Mr. Hildreth [counsel] has a running objection to this and the Court is allowing it in and overruling the objection at this time." Thereafter he testified that the experimental scaffold withstood 1,000 pounds of pressure horizontally without failure; and that he applied 4,000 pounds vertical pull on the scaffold without failure.

Defendant asserts that the tests were relevant and admissible as evidence in rebuttal of the testimony of plaintiff's expert witness Peterson regarding the strength of the certain designs of scaffolds. ▇ Whether evidence relating to results of experiments should be received is a matter which lies largely within the discretion of the trial court. (*Odell* v. *Frueh,* 146 Cal.App.2d 504 [304 P.2d 45]; *People* v. *Ely,* 203 Cal. 628, 632-633 [265 P. 818]; *Larramendy* v. *Myres,* 126 Cal.App.2d 636, 642 [272 P.2d 824].) ▇ The court did not err in receiving the evidence concerning the tests.
. As above stated, there was evidence that the scaffold as constructed by defendant had been changed by persons other than defendant or his employees. The father of plaintiff testified that before the accident occurred he (the father) had removed all the "tie-ins" on the north wall. There was evidence that there were only a few "tie-ins" on the east wall; there were no "tie-ins" on the south wall; a guard rail had

been removed from the upper level on the north side of the building; and two guard rails had been removed from the south side of the building. As shown above, after the "tie-ins" were removed there were holes in the plaster where the "tie-ins" had been during the plastering. The jury might have inferred that the "tie-ins" were removed in order to plaster the holes and complete the plastering work while the scaffold was there. Appellant states in his brief that defendant tried the case on the theory that the scaffold collapsed as a result of certain parts of the scaffold having been removed by persons other than the defendant or his employees. Whether or not such parts were so removed and whether such removal, if any, was a proximate cause of the collapse of the scaffold were questions of fact for the determination of the jury.

The members of the jury were unanimous in returning a verdict for defendant. The judge denied a motion for a new trial. The evidence was sufficient to support the verdict.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.