[Crim. No. 23580. Second Dist., Div. Five. Dec. 21, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNIE KERMIT WILLIAMS, Defendant and Appellant.

## COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Bradley A. Stoutt, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ASHBY, J.**—Defendant appeals from a judgment (order granting probation) following his conviction by jury trial of embezzlement in violation of Penal Code section 508.[1] Appellant was on duty as a truck driver for Union Oil Company from midnight to 10 a.m. on Sunday, November 14, 1971. He was instructed to take 6,100 gallons of super gasoline and 2,400 gallons of regular gasoline from the Union Oil Terminal located at 135th and

---

[1] Appellant also purports to appeal from the order denying his motion for new trial. Such order is not separately appealable but may be reviewed on appeal from the judgment. (Pen. Code, § 1237.)

Broadway in Los Angeles to service station No. 4687, in Thousand Oaks, Ventura County, owned by Ray Blackburn. A replenishment delivery ticket signed by appellant was the invoice to station No. 4687 for his November 14, 1971, delivery. According to the ticket appellant delivered 6,270 gallons super and 2,280 gallons of regular to the station at a price to the dealer of $.304 per gallon super and $.273 per gallon regular. The delivery occurred while the station was closed. According to the ticket there were 1,300 gallons of super and 1,000 gallons of regular in the tanks of the dealer prior to the delivery of the gas from the truck. This figure is obtained by the driver by "sticking the tank" upon arrival. A gauge stick for sticking into the dealer's tanks to determine the gallonage prior to replenishment was part of the truck's equipment.

A second delivery was made by another driver to Blackburn's station at approximately 9 p.m. Sunday evening, November 14, 1971. That driver measured the tanks and determined that prior to his delivery there were 6,980 gallons of super and 2,290 gallons of regular in the dealer's tanks. He added 2,300 gallons of super and 6,300 gallons of regular.

Mr. Blackburn arrived at his station Monday morning, November 15, and found two invoices for deliveries made to his station between November 13 and 15. Blackburn kept a monthly profit guidebook which revealed the gas sold each day at his station. It recorded the meter readings and the tank stickings each day at the close of business. Employees who opened the station the next day would double check these readings to make sure they were correct. Based on his records for November 13 and 14 and the sticking of his tanks, Blackburn concluded that he was short almost 2,000 gallons, 1,091 gallons of super and 904 gallons of regular. Blackburn requested Charles Richardson, a dealer sales representative for Union Oil Company, to inventory the station. He did so on November 15 and concluded that there was a shortage of 1,047 gallons super and 1,442 gallons regular. Frank Forester, senior auditor, performed a stock reconciliation on November 17 and concluded that a shortage of 967 gallons super and 829 gallons regular was sustained at the station on November 14. He concluded that the shortage was due to the fact that there was more gasoline in the dealer's tank prior to appellant's delivery than was represented by appellant on the delivery replenishment ticket and that appellant delivered less gasoline than represented on the ticket. For instance, appellant should have obtained a figure of 2,267 gallons of super in the tank prior to delivery instead of appellant's recorded figure of 1,300 gallons, and appellant put 5,303 gallons into the tank rather than the 6,270 gallons he reported.

The prosecution then presented evidence that appellant delivered the missing gasoline to the service station of Han Ho Choe located on Crenshaw Boulevard in Los Angeles. Forester performed a stock reconciliation on Choe's station which revealed an overage of 2,122 gallons of super as of 8 a.m. on November 14, 1971. Choe had a delivery entered on November 13 or 14 from Union Oil of which Union Oil had no record. There were three checks from Mr. Choe deposited in appellant's checking account, $300 on November 19, $300 on November 11, and $288 on November 4.

Union Oil trucks were equipped with a tachograph. This was a device attached to the speedometer cable of the truck which measured on a wax-coated chart with three steel styli the revolutions of the engine, the vehicle's speed, the distance traveled by the vehicle, and time. An expert in interpretations of tachographs, Mr. Martineau, testified that as the tachograph revealed the miles traveled and where during the course of travels stops occurred, he could, by knowing the point of departure, eliminate alternative routes from that point and determine the route actually taken. He was retained by Union Oil Company to locate the "coffee stop" indicated on appellant's tachograph chart for November 14, 1971. He determined from the chart that the location of the "coffee stop" was the intersection of Crenshaw and Adams in Los Angeles, the location of Choe's service station. The tachograph indicated that appellant stopped at 5:54 a.m. and left in eight minutes at 6:02 a.m. This was consistent with the delivery of the missing gasoline to Choe since 300 to 400 gallons per minute could be run through the truck's bypass valve. Martineau concluded from the tachograph that appellant then left Choe's station and went in the direction of Blackburn's station in Thousand Oaks by driving north on the San Diego Freeway through Sepulveda pass. However, the tachograph box was then opened, which caused it to stop recording.

The prosecution also introduced evidence of similar conduct by appellant on October 31, 1971, to show knowledge, intent and common scheme or plan. On that date appellant was dispatched with 6,190 gallons of super and 2,430 gallons of regular to be delivered to station No. 5285 at 21471 Brookhurst in Huntington Beach. The delivery records indicated that these amounts had been delivered. However, a tank sticking by the lessee of that station, Douglas Wilson, indicated that he was short 1,338 gallons of super and 964 gallons of regular. This shortage was confirmed by an audit by Union Oil. Mr. Martineau examined appellant's tachograph chart for October 31, 1971, and concluded that an 11-minute stop which appellant indicated as "traffic" was located at Crenshaw and Adams in Los Angeles.

The tachograph chart on appellant's truck was in good working order. Out of seven tachograph charts where appellant was the driver, six had been tampered with. There were no leaks in the gas tanks at Blackburn's and Wilson's service stations, and the pumps were properly calibrated.

Appellant testified in his own behalf, denying that he ever delivered gasoline except as instructed. He testified that on November 14 he left the Harbor Freeway at Vernon Avenue and went back to Denny's at Vermont and El Segundo where he met another driver, Russ Richards, for coffee. He then went to Blackburn's station in Thousand Oaks by way of the Harbor and Hollywood Freeways, not the Santa Monica and San Diego Freeways, and delivered his gasoline. As to the October 31 delivery appellant testified that he delivered his gasoline to Wilson's station in Huntington Beach, then made a wrong turn on the freeway on his way back to Los Angeles, and eventually got caught in a traffic jam near the Coliseum due to a football game. He testified that he met Mr. Choe early in 1970 and was a regular customer at Choe's station, since he lived nearby. He borrowed money on many occasions from Choe. Choe testified to his friendship with appellant, and how he had loaned money to appellant. Their procedure was that appellant would write Choe a postdated check, Choe would then write appellant a check for the loan, and Choe would hold appellant's postdated check until the loan was repaid.

Appellant contends that the Superior Court of Ventura County lacked jurisdiction and that the court erred in admitting Martineau's testimony, Blackburn's business records and evidence of the October 31 incident. We find these contentions without merit.

### JURISDICTION

Appellant contends that the Superior Court of Ventura County was without jurisdiction because the venue could properly be laid only in Los Angeles County. He contends that no part of the crime was committed in Ventura County. The information charged appellant with embezzlement in violation of Penal Code section 508 in the following language, in that "being an agent or servant of the Union Oil Company of California, he did fraudulently appropriate to his own use or secrete with the fraudulent intent to appropriate to his own use the property of the Union Oil Company of California of a value greater than $200.00, which property came into his control or care by virtue of his employment as such agent or servant." He contends that under the prosecution theory of the case the gasoline was entrusted to him at the Union Oil Company Terminal in Los Angeles, and was appropriated by him for his own use when it

was delivered to the service station of Han Ho Choe, also located in Los Angeles County, and that the crime was completed at that point. He contends that the acts he committed in Ventura County, that is, the falsification of the amount of gasoline delivered to Blackburn's station in Thousand Oaks, were not part of the crime but merely an effort to conceal his prior misappropriation of the gasoline in Los Angeles County. We find that the evidence is sufficient to sustain venue in Ventura County.

Penal Code section 781 provides: "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory." Section 781 is a remedial statute intended to broaden criminal jurisdiction beyond the rigid limits fixed by the common law in cases of crimes committed in more than one jurisdiction. (*People* v. *Powell,* 67 Cal.2d 32, 63 [59 Cal.Rptr. 817, 429 P.2d 137].) Being a remedial statute it has been "liberally construed." (*People* v. *Simms,* 144 Cal.App.2d 189, 197 [300 P.2d 898].)

The argument that the act committed in a territorial jurisdiction must be one which involves a necessary element of the crime was long ago rejected in *People* v. *Megladdery,* 40 Cal.App.2d 748, 774-775 [106 P.2d 84], where the court said that such an interpretation "would completely disregard the phrase 'or the acts or effects thereof constituting or requisite to the consummation of the offense' contained in the section. Obviously, the phrase, 'or requisite to the consummation of the offense', means requisite to the completion of the offense—to the achievement of the unlawful purpose—to the ends of the unlawful enterprise. By the use of the word 'consummation' the Legislature drew a distinction between an act or an effect thereof which is essential to the commission of an offense, and an act or effect thereof which, although unessential to the commission of the offense, is requisite to the completion of the offense —that is, to the achievement of the unlawful purpose of the person committing the offense."

Section 781 should be interpreted in a commonsense manner with due regard to the factual circumstances of the case rather than technical niceties. (*People* v. *Powell, supra,* 67 Cal.2d at p. 62.) This was also done in *People* v. *Reed,* 113 Cal.App.2d 339, 354-355 [248 P.2d 510], where the court said, "Here we have a chain of events, all interconnected, occur-

ring within a short period of time and constituting a single transaction." In that case the defendant was convicted in San Francisco of sending a false telegram with intent to deceive, even though the telegram was actually sent from Los Angeles, after the defendant instructed his secretary in San Francisco to fly to Los Angeles to do so.

In the instant case even though the falsification of the amount of the delivery to the service station in Ventura County was not, technically speaking, an element of the crime of embezzling the gasoline by appropriating it in Los Angeles County, it was part of a closely connected series of events constituting in effect a continuing transaction. Appellant, dispatched to deliver the gasoline to Ventura County, made a short stopover where he sold the gasoline to Han Ho Choe, and then continued his trip to Ventura County. Obviously appellant had to falsify the amount of delivery to Ventura County or he would be questioned immediately upon his return to the terminal. Under the circumstances of this case the trip to Ventura County and falsification of the delivery records there were so closely connected in time to the misappropriation of the gasoline, and so obviously required if appellant was to successfully complete his run, that Ventura County had jurisdiction under the above interpretation in *People* v. *Megladdery.*

Merely because the crime was "complete" in the sense that it would warrant prosecution upon the sale of the gasoline to Han Ho Choe, does not mean that subsequent events must be ignored for purposes of determining venue. Such a contention was also rejected in *Megladdery.* There the court said, "By his second contention [defendant] would limit the essential or necessary elements of an offense or its effects to those acts or effects of acts occurring prior to the instant that the offense becomes sufficiently complete to warrant prosecution. Under the interpretation we have already given to the section, this construction cannot be sustained. That the interpretation contended for by the [People] is the correct one is demonstrated by a reference to the cases." (*People* v. *Megladdery, supra,* 40 Cal.App.2d at p. 775.) The court's discussion of *People* v. *Graves,* 137 Cal.App. 1 [29 P.2d 807], *People* v. *Boggess,* 194 Cal. 212 [228 P. 448], and *People* v. *Grubb,* 24 Cal.App. 604 [141 P. 1051], is particularly instructive. (*People* v. *Megladdery, supra* at pp. 775-777.)

In *Graves* the defendant was charged in Los Angeles County with the crime of receiving and agreeing to receive a bribe to vote in a certain manner in his capacity as a member of the board of supervisors. Although the date of the agreement is not stated in the *Graves* opinion, obviously it occurred prior to the time of the vote. Although the bribe was paid

in San Francisco, the fact that the vote was given in Los Angeles was held sufficient to sustain jurisdiction in Los Angeles. "In other words, the dishonest vote was not an essential part of the crimes charged, and the crime was complete before the vote was given, but, nevertheless, it was held, and properly so, that Los Angeles had jurisdiction—the vote was a legal effect of the corrupt agreement, and that gave Los Angeles jurisdiction." (*People* v. *Megladdery, supra,* 40 Cal.App.2d at p. 775.)

In *People* v. *Boggess, supra,* 194 Cal. 212, the defendant filed a false document under the Corporate Securities Act with the San Francisco office of the Commissioner of Corporations and paid the filing fee there. In the normal course of events the application was forwarded to the Sacramento office of the commissioner and there investigated and found to be false. It was held that Sacramento County had jurisdiction under Penal Code section 781. "No essential element of the crime was committed in Sacramento—he could have been prosecuted in San Francisco, the crime having been completed there—but one of the effects of the San Francisco acts was the transmittal of the application to Sacramento." (*People* v. *Megladdery, supra,* 40 Cal.App.2d at p. 776.)

In *People* v. *Grubb, supra,* 24 Cal.App. 604, the defendant, in Los Angeles, solicited a woman to engage in prostitution in San Francisco and wrote a letter to San Francisco to make the arrangements. When the woman arrived in San Francisco she refused to engage in prostitution. The defendant was convicted in San Francisco of an attempt to commit pandering even though he acted only in Los Angeles. Jurisdiction of San Francisco was upheld under Penal Code section 781. (24 Cal.App. at p. 609.) As described by *Megladdery,* "Clearly, the crime was complete in Los Angeles—but it was a continuing transaction." (40 Cal.App.2d at p. 777.)

In *Megladdery* itself, Megladdery was charged with soliciting a bribe and asking and agreeing to receive (but not receiving) a bribe from one Bent to influence the Governor to pardon a man. The essential elements of the crime were committed by Megladdery in San Francisco, where he negotiated the matter with Bent. Certain money was actually paid, on Megladdery's instructions, to an attorney named Geary in Oakland, Alameda County. Jurisdiction of Alameda County was upheld. The court said, "So far as the asking and agreeing to receive a bribe is concerned, again the case is one where the 'effects . . . requisite to the consummation of the offense' occurred in Alameda County within the meaning of section 781. Clearly, if Bent is to be believed, acts requisite to the achievement

or end of the unlawful purpose occurred in Alameda County." (40 Cal. App.2d at p. 780.)

In another case subsequent to *Megladdery*, the court upheld jurisdiction based upon the effects of the defendant's acts in another county, *People v. Wallace,* 78 Cal.App.2d 726 [178 P.2d 771]. In that case a man named Thomas falsely claimed to have been struck and injured by an automobile driven by a woman named Fong in Oakland, Alameda County. He filed civil suit against her in Alameda County. Wallace was a doctor in Fresno County. He gave false testimony in a deposition taken in Fresno concerning treatment allegedly given by him there to Thomas, knowing that the deposition would be used in connection with Thomas' suit against Fong in Alameda County. Thomas and Wallace were convicted in Alameda County of attempted grand theft from Fong and her insurance company. Although Wallace had acted solely in Fresno County, it was held that he was subject to the jurisdiction of the court in Alameda County. The court pointed out that "Wallace knew that the impact of such acts would be felt in Alameda County and he knew that such acts were intended to culminate in a trial or settlement in Alameda County. These acts by Wallace were indispensable to the success of Thomas' scheme. Medical information concerning Thomas was an essential requirement for the successful culmination of the damage action." (78 Cal.App.2d at p. 748.)

The court further stated, "It must be remembered that in order to find that Alameda County had jurisdiction it is only necessary to find that some act of Wallace constituting an attempt had its effect in Alameda County." The court further stated that Penal Code section 781 "is not limited to those acts or effects of acts occurring prior to the instant the offense became sufficiently complete to warrant prosecution—it likewise applies to acts 'requisite to the consummation of the offense.' " (78 Cal. App.2d at pp. 748-749.) The court then quoted extensively from *Megladdery.*

Appellant urges us not to follow *Megladdery.* We see no reason to depart from it. The entire discussion of Penal Code section 781 in *Megladdery,* authored by Mr. Justice Peters when he was Presiding Justice of the Court of Appeal, First Appellate District, Division One, was cited with approval by our Supreme Court in *People v. Buffum,* 40 Cal.2d 709, 717 [256 P.2d 317], and has been cited in numerous subsequent cases. (See, e.g., *People v. Buono,* 191 Cal.App.2d 203, 223 [12 Cal.Rptr. 604]; *People v. Simms, supra,* 144 Cal.App.2d 189, 197; *People v. Reed, supra,* 113 Cal.App.2d 339, 355.)

Appellant's reliance upon *People* v. *Jones,* 9 Cal.3d 546, 556 [108 Cal. Rptr. 345, 510 P.2d 705], is misplaced. He borrows language from *Jones* holding that the Sixth and Fourteenth Amendments to the United States Constitution "guarantee a criminal defendant in a state trial the right to be tried by an impartial jury comprising a representative cross-section of, and selected from residents of, the judicial district where the crime was committed." *People* v. *Jones* had nothing to do with interpretation of Penal Code section 781, however. It involved the peculiar problems of the different judicial districts entirely within Los Angeles County, and the crime involved occurred entirely within the central judicial district of Los Angeles County. Nothing in *Jones* purports to deal with the problems to which Penal Code section 781 is directed.

In the instant case appellant's misappropriation of the gasoline was part of a continuing transaction involving his assigned trip to Ventura County. Appellant knew and intended that it would have an effect upon the station in Ventura County. The falsification of delivery records in Ventura County was obviously necessary to the achievement of appellant's unlawful purpose. Ventura County had jurisdiction of the offense.

### MARTINEAU TESTIMONY

■ Appellant contends that the court erred in admitting the testimony of Frank Martineau concerning his conclusion based upon the "tachograph" chart on appellant's truck, that the "coffee" stop indicated on the chart was located at the intersection of Crenshaw and Adams in Los Angeles, the site of Han Ho Choe's service station. The court held a hearing outside the presence of the jury prior to trial and determined that the testimony was admissible.

As indicated above, the tachograph was a device attached to the speedometer cable of the truck which measured on a chart the revolutions of the engine, the vehicle speed, and the distance traveled. These factors were also correlated with time by a clock in the device. Certain motions of the styli also indicated swerving or side motion.

Mr. Martineau had begun in the speedometer business in 1955, and since 1967 had operated his own company as a measuring and recording consultant for various trucking firms and developed an expertise in the operation and maintenance of tachographs. He was hired by Union Oil Company in January 1972 to attempt to determine the location of the "coffee" stop indicated on appellant's tachograph chart. Union Oil Company officials did not indicate to him any location that was suspected of being

the "coffee" stop. Martineau formed the opinion that the "coffee" stop was located at the intersection of Crenshaw and Adams in the following manner: It was given that the starting point on the chart was the Union Oil Terminal at 135th and Broadway in Los Angeles. The chart indicated how far, for how long and at what speeds the vehicle traveled. Freeway driving could be easily identified by sustained periods of driving at high rates of speed in contrast to stop and go driving on surface streets. The chart indicated that appellant's truck entered a freeway after going 1½ miles on surface streets. Freeway driving then continued for approximately 12 miles, although at one point the truck slowed to 20 miles per hour. The truck then left the freeway and turned to surface streets.

Using his own car and a map, Martineau determined by a trial and error method of eliminating the possibilities that appellant entered the Harbor Freeway and proceeded north, slowed as he turned to the west-bound Santa Monica Freeway, exited at Crenshaw, and proceeded to Crenshaw and Adams.

After reaching this conclusion Martineau requested Union Oil Company to provide him with the tachographs of three other drivers enroute from the terminal to the service station of Han Ho Choe at Crenshaw and Adams. These three charts indicated the same pattern as appellant's.

Appellant's tachograph chart indicated that the engine of the truck was running during the entire eight-minute period of the "coffee" stop. By use of the same method Martineau concluded that appellant then re-entered the freeway at La Brea, and took the Santa Monica Freeway west and the San Diego north to the point the device was opened or tampered with.

Appellant argues that Martineau's "method" of calculating the location of the "coffee" stop was in the nature of a scientific test, and compares it to blood testing, fingerprinting, and "voice printing." On that assumption he argues that Martineau's method of interpreting the tachograph chart was not shown to be "generally accepted" in the scientific community, and that it was not shown to be "reliable." Appellant's analogy to scientific tests is not well taken. Mr. Martineau's qualifications to read the tacho-graph charts cannot be questioned. What appellant really objects to is not Martineau's conclusions about the speed and distance traveled by appellant, but rather Martineau's experiment with a car and a map which indicated that the described route to Crenshaw and Adams was consistent with the chart. What Martineau did was not a scientific test which had to be validated by experts in the field. He read a map, read an odometer, and used his eyes to observe whether freeway ramps and other

intersections existed on a route of travel—perfectly ordinary investigative techniques. Moreover, the reliability of Martineau's method was confirmed by the fact that he was not given the suspected location to work backwards from and yet after he arrived at his conclusions three other tachograph charts showing trips by other drivers from the terminal to Han Ho Choe's service station revealed the same pattern.

It is well established that it lies within the sound discretion of the trial court to admit evidence of an experiment, the conditions and circumstances of which would render it of value to the jury. (*Odell* v. *Frueh,* 146 Cal.App.2d 504, 511-512 [304 P.2d 45, 76 A.L.R.2d 345]; *Yecny* v. *Eclipse Fuel Engineering Co.,* 210 Cal.App.2d 192, 204-205 [26 Cal. Rptr. 402]; *Buratti* v. *Phetteplace,* 196 Cal.App.2d 303, 309 [16 Cal. Rptr. 500].) Appellant was free to cross-examine Martineau about the weaknesses in his method, or to present evidence that the tachograph chart was consistent with other hypotheses and to argue to the jury the weight of the evidence. The trial court did not abuse its discretion in admitting the evidence.

## BUSINESS RECORDS

Appellant contends that the court erred in admitting evidence of Mr. Blackburn's monthly profit guidebook because the evidence failed to meet the standards of admissible business records under Evidence Code section 1271. In particular he contends that the evidence failed to satisfy section 1271 subdivision (d) that "[t]he sources of information and method and time of preparation were such as to indicate its trustworthiness."

Mr. Blackburn testified that the records were prepared in the following manner: At the close of each business day an employee would measure the gasoline remaining in the tanks by "sticking the tank" with a stick which indicated the height of the gasoline in inches, which was then converted to gallons by means of a conversion chart. The employee would write the stick reading on a form and place it on Blackburn's desk. The readings were double checked by the employee who opened the station in the morning to verify that they were the same as the closing readings from the night before. Blackburn would take the figure supplied on that form and enter it in the monthly profit guidebook. He would save the form on which the stick readings were entered for one day and then throw it away. Blackburn worked on Saturday, November 13, 1971, and did Friday's bookwork then. He did not work on Sunday, the fourteenth. When he came to work Monday morning, the fifteenth, he found the usual forms indicating the readings of Saturday and Sunday. The forms containing

the readings were not any different from normal nor was the handwriting different. He also found two invoices for deliveries of gasoline.

Appellant's objection to the introduction of this evidence is based on the fact that Blackburn was unable to testify as to who performed the stick readings and filled out the forms for Saturday night and Sunday. He therefore argues that the source of the information was not shown to be trustworthy. We disagree.

The object of the statute is, of course, to eliminate the necessity of calling each witness. The foundation for admitting the record is properly laid if in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission. This places a broad discretion in the trial court which will not be disturbed on appeal. (*People* v. *Crosslin*, 251 Cal.App.2d 968, 975 [60 Cal.Rptr. 309].) The reasonable inference was that the stick readings were prepared by Blackburn's employees in the normal and usual method. This method was sufficiently trustworthy to be relied upon by Blackburn in the ordinary course of his business.[2] Blackburn verified the most recent reading by sticking the tank himself. The records were admissible. (*Doyle* v. *Chief Oil Co.*, 64 Cal.App.2d 284, 292-293 [148 P.2d 915].)

## ADMISSIBILITY OF OCTOBER 31 DELIVERY

Appellant contends the trial court erred in admitting evidence concerning a similar incident on October 31, 1971, when appellant was dispatched to deliver gasoline to a station in Huntington Beach. He contends the incident was not sufficiently similar to be admissible as evidence of common plan or scheme. We disagree. In both cases the dealer who was supposed to receive the gasoline reported a shortage of roughly 2,000 gallons, appellant made an unscheduled stop at Crenshaw and Adams according to Martineau's testimony, and a check for approximately $300 from Han Ho Choe to appellant was deposited in appellant's checking account several days later. These were sufficient similarities to justify the trial court in exercising its discretion to admit the evidence to show common scheme or plan. (*People* v. *Haston*, 69 Cal.2d 233, 246, 249-250 [70 Cal. Rptr. 419, 444 P.2d 91].) The incident was also admissible to show knowledge or intent. (*People* v. *Nieves*, 2 Cal.App.3d 562, 567 [82 Cal.Rptr.

[2]At trial the senior auditor of Union Oil Company testified that in his opinion Blackburn kept reliable records as indicated by independent inventories.

661]. See also *People* v. *Sam,* 71 Cal.2d 194, 205 [77 Cal.Rptr. 804, 454 P.2d 700].)

The judgment (order granting probation) is affirmed.

Kaus, P. J., and Stephens, J., concurred.

A petition for a rehearing was denied January 10, 1974, and appellant's petition for a hearing by the Supreme Court was denied February 21, 1974.