[Crim. No. 2605. Fifth Dist. Nov. 4, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE MARTINEZ HERNANDEZ, Defendant and Appellant.

COUNSEL

Michael R. Berger, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Michael H. Fabian and Anthony L. Dicce, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GOLDSTEIN, J.*—

FACTS

On August 3, 1975, Susan B., the victim herein, accompanied her boyfriend, Robert Souza, from Ceres in Stanislaus County, to Fresno. They had made a prior arrangement to meet two mutual friends, Richard and Sharron Kelly, husband and wife, at a motel. All four of them had come to Fresno with the intention of obtaining and using heroin.

Susan and her boyfriend arrived in Fresno at about 3:30 p.m. The Kellys arrived at about 4:15 p.m. They immediately went to the room which had been previously rented by Susan and her boyfriend.

Souza procured several balloons of heroin with funds furnished by himself and Richard Kelly. Susan and Souza were the first to inject the heroin. Later, the Kellys did likewise. The injections did not give them the euphoric feeling which they expected would follow the injection of heroin.

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

At approximately 8:30 p.m., Souza and Kelly got into a heated argument. Kelly accused Souza of "ripping him off" by buying a substitute rather than real heroin. He also accused Souza of stealing $20 of his money which was missing from the motel room. Kelly later ordered Souza to leave the room.

Souza left and remained outside the room for approximately a half hour. He then entered the car which he had used to bring Susan to Fresno and drove off. Susan waited approximately 45 minutes, until about 9:45 p.m., for him to return. She then realized that Souza had left for good leaving her without return transportation. She asked the Kellys to drive her to the on-ramp at Highway 99 and Fresno Street so that she might "thumb a ride" back to Ceres.

After several futile attempts to obtain a ride, she decided to use the small change in her purse to telephone her sister in Ceres and ask her to take her back to Ceres. As she was walking toward a telephone booth near the highway, an Opel automobile owned and operated by appellant Jose Martinez Hernandez (hereinafter referred to as defendant) stopped near her. There were five individuals, including the driver, in the car, all of whom appeared to her to be younger than herself. She asked where they were going. They explained that they were on their way to Madera. She then told them that she was on her way to Ceres, but would appreciate a ride with them as far as Madera. Because of the crowded condition of the small car she was told that it would be necessary for her to sit on the lap of one of the occupants of the back seat. After expressing her willingness so to do, she got into the vehicle.

All of the occupants of the car lived in the Madera area. The driver, defendant, was 25 years of age, married and the father of two infant girls. Alongside of him in the front seat was his brother-in-law, Ernest Ruiz, age 17 years. In the back seat were three other juveniles, Zero Salinas, age 16 years, Gustavo Hill, age 17 years, and Fernando Ceranza, age 17 years. She sat on Ceranza's lap from the time they left Fresno.

While they were driving toward the Madera County line, the juveniles engaged her in a conversation. She learned that they had been to a dance in Fresno, had thereafter gone to a bar from which they had been ejected, and had finally gone to the west side of Fresno where they drove around looking at the street prostitutes. Susan then asked them what a prostitute charged for her services, and if they had found a prostitute.

They then explained to her that they had run out of money and had, therefore, been unable to engage a prostitute. Thereafter, there was testimony that one of the juveniles produced a marijuana cigarette, lit it and passed it around among all the passengers in the car, including Susan, and that each of them took a "drag" on the cigarette.

Thereafter, the four juveniles in the car engaged in a conversation in Spanish, a language which Susan did not understand. Zero Salinas (who testified at the trial under a grant of immunity), one of the occupants of the car, testified that in the conversation they discussed whether they should try to have sexual intercourse with Susan. All of them agreed to find out if Susan would "go all the way" for them.

When they reached the Herndon Avenue exit of Highway 99, a short distance south of the Madera County line, defendant drove his car off the highway. Susan then became aware of the intent of the occupants of the car to have sexual intercourse with her. She asked them to let her out of the car so that she might go to a truck stop in the vicinity. Defendant refused to let her out of the car. He drove the car back onto Highway 99 in a northerly direction, crossing the San Joaquin Bridge into Madera County.

Susan attempted to climb over the front seat and grab the steering wheel to honk the horn. Ceranza and Hill forcibly restrained her from so doing. She screamed to be let out without avail. When the car reached Avenue 7 (approximately a quarter mile north of the Madera County line), defendant drove the car off the highway onto Avenue 7 a short distance, stopping near an orchard. There were no lights, houses or pedestrians in the vicinity.

After defendant stopped the car, he asked Susan if she would be willing to engage in sexual intercourse and she replied that she did not wish to do so and that she was "not that way." Defendant then got out of the vehicle, walked around to the right side of the car and told everyone to get out. All of the occupants complied with the exception of Ceranza, on whose lap Susan was sitting. Susan then tried to remain in the vehicle. Ceranza pushed her toward the door, Hill then grabbed her by the arm and pulled her out of the car. She was then forced to go into the orchard. At one point, when she saw the lights of a car approaching, she tried to escape by climbing back into the car and locking herself inside; but before she was able to do so, she was pulled away from the car, all the

while screaming to be left alone. When they let go of her she again tried to run away but was caught and pulled back toward the orchard. One of them put his hands over her mouth to prevent her screams from being heard.

Defendant then told her that she would get hurt if she did not submit. She was then pulled back into the orchard. Defendant attempted to remove her clothing. When she protested, she was again told that she would be hurt if she did not consent to have intercourse with the five young men. She partially disrobed and at defendant's command lay down on her back on the ground on some pieces of cloth placed there by her captors.

Defendant was the first to have intercourse with her, followed by Ernest Ruiz, Fernando Ceranza and Gustavo Hill. Zero Salinas attempted intercourse but was unable to complete the act.

Thereafter, Susan cleaned herself up, dressed and asked to be taken back to the highway. On the way to the highway, Susan sat in the front seat with Ernest Ruiz and defendant. When they reached Cleveland Avenue near the City of Madera off-ramp, defendant drove off Highway 99 at the off-ramp and let Susan out of the car. Defendant then drove off toward the City of Madera. As they left, Susan removed a piece of paper from her purse and wrote down the license number of defendant's vehicle. She put the paper in her pocket. Someone in the car observed what she was doing and called it to the attention of defendant. Defendant then realized that if the license number of his car was disclosed to the authorities, his identity would be discovered. He immediately backed his car toward Susan who was then walking along the highway. Defendant and his companions mistakenly believed that she had placed the piece of paper with the license number in her purse. Several of the juveniles, together with defendant, jumped out of the car in pursuit of Susan. Hill caught up with her, pushed her to the ground and seized her purse. He ran back to the car with the purse. Defendant and the other occupants of the car rummaged through the purse but failed to find the paper. They then hung the purse on a road sign and again pursued Susan. Susan, who had crossed the highway and was proceeding to a service station for assistance, was finally caught by Ernest Ruiz. He demanded the piece of paper. She took the paper with the license number out of her pocket and gave it to defendant. Then defendant and the other juveniles returned to the car and drove off.

Susan finally reached the service station. The attendant on duty summoned the police. Meanwhile, defendant had dropped off his passengers, three of whom went to a local bar and pool hall. Defendant returned to his home. While at the pool hall, Hill told Salinas that he had heard some money jingling in Susan's purse. Hill and Salinas, accompanied by a third person, returned to the highway, removed the purse from the road sign on which it had been hung and extracted approximately 60 cents from it. Although defendant did not participate in the theft of the money from the purse, he was charged with the offenses of forcible rape, simple kidnaping and robbery in the second degree resulting from the forcible seizure of the purse by him and the other juveniles from the person of Susan B. He was convicted of all three offenses. The court, in pronouncing judgment, ordered that he be sentenced to state prison only for the crime of forcible rape. It stayed the execution of the judgment on defendant's convictions of kidnaping and robbery, pending the completion by him of the sentence on the rape charge or a reversal of the conviction on the rape charge with the proviso that upon completion of the sentence for rape, such stay was to become permanent.

## The Issues

Defendant raises two issues on appeal: (1) Was the County of Fresno vested with territorial jurisdiction to try defendant on the robbery charge? (2) Did the trial court unduly restrict the cross-examination of the victim, Susan B.?

(1) *The Court Had Jurisdiction to Try Defendant for Robbery.*

Defendant complains that the exclusive jurisdiction for the trial of the charge of robbing Susan of her purse resided in Madera County. In support of the foregoing contention, he cites sections 777 and 781 of the Penal Code.

The pertinent portion of section 777 of the Penal Code provides that ". . . except as otherwise provided by law the jurisdiction of every public offense is any competent court within the jurisdictional territory of which it is committed."

Section 781 of the Penal Code provides: "When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consumma-

tion of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory."

Section 781 is a remedial statute. Its purpose is to broaden the rigid common law limits in cases where crimes are committed in more than one county by the same person. As a remedial statute, it must be liberally, not strictly, construed. (*People* v. *Williams* (1973) 36 Cal.App.3d 262, 268 [111 Cal.Rptr. 378].)

*People* v. *Powell* (1967) 67 Cal.2d 32 [59 Cal.Rptr. 817, 429 P.2d 137], is a case having factual similarities to the case at bench. There, the defendant had committed an armed robbery in Los Angeles County. While fleeing from the scene of the robbery, he and his companion in the robbery were stopped in Los Angeles County by two police officers on a charge of driving a vehicle with a license plate that was not illuminated. The officers were disarmed and kidnaped by Powell and his companion at gunpoint. Powell then ordered one of the officers to drive Powell's vehicle in the direction of Bakersfield. While enroute, he told them that they would be released when they reached a remote spot. He also told them that he would throw their guns into the brush where they could be found. He returned to one of the officers some money that he had taken from him earlier that evening. It is clear that defendant's original intention to release the officers changed while they were enroute to Bakersfield. He ultimately decided that only by murdering the kidnaped policemen could he thwart identification and apprehension. After letting them get out of his vehicle as he had originally agreed, he shot one of the officers five times. The wounds were fatal. The other officer escaped unscathed, although defendant fired two shots at him as he was running away. Powell was tried in Los Angeles County on a charge of murder and was sentenced to death.

On appeal, Powell raised the jurisdictional issue contending that he should have been tried in Kern County. He cited section 790 of the Penal Code, which provides that jurisdiction to try a criminal action for murder is in the county (1) where the fatal injury was inflicted, or (2) where the victim died, or (3) where decedent's body was found. None of the foregoing conditions existed in the case of the murdered policeman. Powell contended that Kern County, therefore, had the exclusive jurisdiction to conduct the trial of the murder charge.

The court held that Los Angeles County was a proper county for the trial of the murder charge. It also held that section 781 of the Penal Code ". . . was intended to broaden criminal jurisdiction beyond the rigid limits fixed by the common law in cases of crimes committed in more than one jurisdiction." (*Supra,* 67 Cal.2d at p. 63.) It held that *although* the *kidnaping* was not an *essential element of the murder charge,* there took place in Los Angeles County *sufficient* acts *preliminary* to the murder to allow jurisdiction to attach in that county under section 781 of the Penal Code. In its decision, the court held: "Since section 790 is not exclusive in cases of murder, section 781 may properly be applied here. It follows that although the kidnaping of Officers Campbell and Hettinger in Los Angeles may not have constituted an essential element of the murder offense, there took place in Los Angeles County sufficient acts preliminary to the murder to allow jurisdiction to attach in that county under section 781." (*Supra,* 67 Cal.2d at p. 63.)

In *People v. Williams, supra,* 36 Cal.App.3d 262, the defendant, a truck driver, was charged with embezzlement of gasoline from his employer. His truck was loaded in Los Angeles County. The gasoline was embezzled in Ventura County. He contended that all of the fraudulent acts occurred not in Los Angeles County but in Ventura County, and that therefore, Ventura County had sole jurisdiction to try him for the offense. On appeal the conviction was affirmed. The court quoted with approval from *People v. Reed* (1952) 113 Cal.App.2d 339, 355 [248 P.2d 510]: " 'Here we have a chain of events, all interconnected, occurring within a short period of time and constituting a single transaction.' " (*Supra,* 36 Cal.App.3d at pp. 268-269.)

In *People v. Powell, supra,* 67 Cal.2d 32, the defendant's decision to commit the murder was made after the crime of kidnaping had been completed, and only when he came to the conclusion that it would be necessary to murder the victims of the kidnaping to protect himself from detection and apprehension for the crime of robbery which he had previously committed. ■ In the case at bench, defendant, when planning and committing the rape and kidnaping of Susan, had no intention of committing the robbery offense because the circumstances giving rise to the robbery had not yet arisen. His decision to commit the robbery occurred only when he learned that Susan had written his license number on a piece of paper which he believed she put in her purse. The robbery of Susan, as did the murder in the *Powell* case, served only to sever the trail that would inevitably lead to the discovery that the defendant had been involved in the earlier crimes. It was,

therefore, necessary to the successful completion of those offenses without detection by the law enforcement authorities.

In *People* v. *Williams, supra,* 36 Cal.App.3d 262, the court summarized the basis for the ruling that criminal acts occurring during the commission of a single transaction may be prosecuted in any county affected by the transaction, regardless of where the essential elements of any crime involved in such acts occurred. The court, relying upon *People* v. *Megladdery* (1940) 40 Cal.App.2d 748, 774-780 [106 P.2d 84], stated: "The argument that the act committed in a territorial jurisdiction must be one which involves a necessary element of the crime was long ago rejected in *People* v. *Megladdery* . . . where the court said that such an interpretation 'would completely disregard the phrase "or the acts or effects thereof constituting or requisite to the consummation of the offense" contained in . . . section [781 of the Penal Code]. Obviously, the phrase, "or requisite to the consummation of the offense," means requisite to the completion of the offense—to the achievement of the unlawful purpose—to the ends of the unlawful enterprise. By the use of the word "consummation" the Legislature drew a distinction between an act or an effect thereof which is essential to the commission of an offense, and an act or effect thereof which, although unessential to the commission of the offense, is requisite to the completion of the offense—that is, to the achievement of the unlawful purpose of the person committing the offense.' " (*Supra,* 36 Cal.App.3d at p. 268.)

The same individuals were implicated in the commission of the three crimes of kidnaping, rape and robbery; they occurred consecutively in a relatively brief period of time; and all of them had as their objectives the successful consummation of a common purpose. We, therefore, hold that Fresno County was a proper county for the trial of defendant on the charge of robbery.

■ There is yet another reason why defendant may not raise the question of jurisdiction. Defendant makes no complaint of the action taken by the trial court in staying the execution of the judgment on his robbery and kidnaping convictions until the completion of his sentence on the rape charge, after which such stay will become permanent. Only in the event of the reversal of that conviction will defendant be subject to possible additional punishment for the crime of robbery. The basis for the stay was the established rule that where a lesser offense of which defendant is convicted is a part of the same transaction involving the more serious offense, the defendant must be punished only for the more

serious offense. (Pen. Code, § 654; *People* v. *Beamon* (1973) 8 Cal.3d 625, 636-640 [105 Cal.Rptr. 681, 504 P.2d 905]; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 18-21 [9 Cal.Rptr. 607, 357 P.2d 839].) Had defendant been subjected to trial in the two separate jurisdictions of Fresno and Madera Counties, in the former for rape and kidnaping, and in the latter for robbery, it could well have resulted in the imposition of additional punishment for the crimes of which he had been convicted. He cannot inconsistently contend that he is entitled to the suspension of the sentence for the robbery conviction and that such sentence is to be permanently stayed when he has completed serving the sentence on the rape conviction on the ground that they were part of the same transaction, and at the same time, urge that they called for independent and separate trials on jurisdictional grounds.

(2) ■ *The Trial Court Did Not Unduly Restrict Defendant's Cross-examination of the Witness Susan B.*

Before the commencement of the trial of the case-in-chief, the prosecution moved to prevent the introduction of any evidence relating to the injection by Susan of the substance which she believed to be heroin, occurring at approximately 4:30 p.m. on the same day on which defendant committed the offenses for which he was tried. The court ordered that a "preliminary fact" hearing be held under section 402 of the Evidence Code to determine whether or not the testimony was admissible under section 352 of the Evidence Code.[1] After hearing the evidence submitted by both sides, the court granted the motion, ruling that it would unduly extend the trial and that its probative value was outweighed by the time consumed in presenting the evidence thereof. The court ruled that in the exercise of discretion it was proper for it to exclude the proffered evidence.

Defendant contends that the court's ruling unreasonably restricted his right to cross-examine the victim, thereby violating his rights under the Sixth Amendment to the United States Constitution and section 15 of article I of the California Constitution, as well as section 686 of the Penal Code. All of the foregoing provisions relate to the right of a defendant to confrontation by witnesses and the right to cross-examine such witnesses.

---

[1]Section 352 of the Evidence Code provides as follows: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger or undue prejudice, of confusing the issues, or of misleading the jury."

In *People* v. *Ortega* (1969) 2 Cal.App.3d 884, 898-902 [83 Cal.Rptr. 260], the court held that proof of a narcotic addiction, standing alone, is inadmissible to impeach the credibility of a witness and that such evidence is not only collateral thereto but highly prejudicial. In cases decided after *People* v. *Ortega, supra,* it has been held that such evidence is inadmissible unless testimony of the use of heroin or any other drug tends to show that the witness was under the influence thereof either (1) while testifying, or (2) when the facts to which he testified occurred, or (3) that his mental faculties were impaired by the use of such narcotics. (*People* v. *Smith* (1970) 4 Cal.App.3d 403, 411-412 [84 Cal.Rptr. 412].) There was *no evidence whatsoever at the "preliminary fact" hearing* conducted by the trial court that Susan was under the influence of any narcotic or drug at any time prior to the occurrence of the events leading to defendant's conviction, or that her mental faculties were impaired to any degree by the use of narcotics. The testimony adduced both by defendant and the People was that she had given herself an injection of lactose and brown sugar, and that she appeared thereafter to be normal and not under the influence of any drug or intoxicant. All the witnesses who were called to testify on the subject, namely, Sharron Kelly, and Harry Haring (a police officer who interviewed the victim shortly after the incident in question), testified that she appeared to be completely normal. Susan testified that the injection had no effect on her.

During the argument on the motion, the court agreed that the testimony of the complaining witness, the officer who observed her and Sharron Kelly, who was present in the motel, failed to show that Susan had used heroin or any other narcotics while at the motel in Fresno. The court properly exercised its discretion under section 352 of the Evidence Code in granting the motion to bar the tendered impeaching evidence.

In *People* v. *Eisenberg* (1968) 266 Cal.App.2d 606, 615 [72 Cal.Rptr. 390], the court held that although section 780 of the Evidence Code prescribed no specific limitation on the use of impeaching evidence on collateral grounds, all of such evidence is not ipso facto admissible. It quoted the following Law Revision Commission comment: " 'The effect of section 780 (together with section 351) is to eliminate this inflexible rule of exclusion. This is not to say that all evidence of a collateral nature offered to attack the credibility of a witness would be admissible. Under Section 352, the court has substantial discretion to exclude collateral evidence. The effect of section 780, therefore, is to *change the present somewhat inflexible rule of exclusion to a rule of discretion to be exercised*

*by the trial judge.'* " (*Supra,* 266 Cal.App.2d at p. 615, fn. 1; italics added.)

Defendant advances two theories which he contends support the use of the alleged impeachment evidence. Neither is supported either by logic or law. First he maintains that evidence of Susan's willingness to use heroin would rebut her testimony denying that she smoked the marijuana cigarette that was passed around in defendant's vehicle or that she had not used marijuana within the last five years. Even though her foregoing testimony was false, her willingness to use heroin would be irrelevant as to the use of marijuana. Defendant erroneously assumes that these two distinct and diverse substances should be placed in the same category. It is contrary to reality and the express legislative pronouncement of the distinctions between them. (Cf. Health & Saf. Code, §§ 11350-11355 with Health & Saf. Code, §§ 11357-11361.)

Defendant advances the second theory in support of the impeachment value of the testimony based upon the contention that the jurors should have heard the full story of what transpired at the motel because they *might have believed* that Susan, unknowingly having been given a nonnarcotic substance by her boyfriend, could have retaliated against him by consenting to sexual intercourse with defendant and his four companions. Of course, the use of heroin or lack of it would have had no bearing upon whatever feeling Susan may have harbored against Souza for giving her the placebo. Defendant's contention that Susan would have retaliated against Souza's behavior by agreeing to seriatim sexual intercourse with defendant and the four juveniles in a dark orchard in Madera County is absurd on its face. Her strenuous resistance to participation in such activity is a complete refutation of any such theory. Moreover, there is not the slightest evidence that she participated in having sexual relations with defendant and his companions because of her feelings toward Souza.

Defendant erroneously relies on *Davis* v. *Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347, 94 S.Ct. 1105]. There the court ruled that the confrontation clause in the Constitution gives the defendant a right to impeach the credibility of a prosecution witness concerning bias resulting from the witness' status as a juvenile delinquent on probation. There, the defendant attempted to show that the witness acted and testified out of fear of possible jeopardy to his probation status and that his identification of the defendant was actuated by a desire to shift suspicion

from himself as a suspect. It was also contended that he acted under pressure from the police out of a fear of possible revocation of his probation status.

In the case at bench, the attempted impeachment is wholly unrelated to any claim of bias and could in no way affect the motive of Susan in testifying against defendant.

We find that the trial court properly exercised its discretion in refusing to permit evidence of the injection which had been self-administered by Susan.

The judgment is affirmed.

Franson, Acting P. J., and Thompson, J.,* concurred.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.